**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEBRA L. ALEXANDER, adoptive parent and Administratrix of the Estate of Scott Alonzo Alexander, | : : : | CASE NO.:  3:13-cv-01758-EMK |
| Plaintiff | : | JUDGE EDWIN M. KOSIK MAG. JUDGE JOSEPH F. SAPORITO, JR. |
| | : | |
| v. | : | *Electronically Filed* |
| | : | |
| MONROE COUNTY; et al. | : | JURY TRIAL DEMANDED |
| Defendants | : | |

**PRIMECARE MEDICAL DEFENDANTS' BRIEF**
**IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

### I. HISTORY OF THE CASE

This matter arises from the suicide of Scott Alonzo Alexander during his incarceration at the Monroe County Correctional Facility (MCCF).  Plaintiff commenced this action with the filing of a Complaint on June 25, 2013.  Plaintiff filed an Amended Complaint on September 13, 2013, and a Second Amended Complaint on November 5, 2013.  (Doc. 37.)

PrimeCare Medical, Inc. (hereinafter "PrimeCare") is contracted with Monroe County to provide medical services to inmates incarcerated in MCCF.  Dr. Debra Wilson and Wendy Johnson, LPN are employed by PrimeCare to provide medical services at MCCF.  Plaintiff has agreed to dismiss any and all claims as to Dr. Wilson and Wendy Johnson.  The remaining claims against PrimeCare are contained in Count IV and Count V pursuant to 42 U.S.C. § 1983, and Count VI for negligence.  Plaintiff has also made a request for the imposition of punitive damages.

Scott Alexander began his relevant incarceration at MCCF on April 24, 2011. (Plaintiff's Complaint (Doc. 2), ¶ 21.)  Mr. Alexander had been charged with theft by unlawful taking, receiving stolen property, and recklessly endangering another person. (Doc. 2, ¶ 19.)  Mr. Alexander was on parole at the time of his arrest for prior criminal charges.  (Doc. 2, ¶ 20.)

Upon intake to MCCF, Mr. Alexander under went an initial medical screening and an Intake Suicide Screening.  (Exhibits A and B[1] attached to PrimeCare Medical Defendants' Statement of Undisputed Facts.)  The Intake Suicide Screening contains a number of questions and assigns a point total to the responses provided to the questions.  If an inmate scores an 8 or more on the screen, he is placed on a suicide watch.  (Exhibit B.)  Mr. Alexander scored a 21 and was placed upon a Level One suicide watch.  (Exhibit B.)

PrimeCare has a suicide prevention policy.  See, Exhibit C.  The suicide prevention policy conforms to National Commission on Correctional Healthcare standards. See, Exhibit D.

Mr. Alexander was evaluated by Jennifer Pitoniak, LSW on April 26, 2011, at approximately 11:30 a.m.  (Exhibit E, p. 1.)  Ms. Pitoniak has a Bachelor's and Master's degree from Marywood University, and she is a licensed social worker in the Commonwealth of Pennsylvania.  (Exhibit F, p. 7, lines 5-22.)

There are three levels of suicide precautions:  Level I, Level II, and Level III.  (Exhibit F, p. 27, line 13 through p. 28, line 7.)  A Level I suicide watch is where the inmate only has access to a suicide smock, suicide blanket, and would have finger foods.  The inmate is also closely watched by security staff every fifteen minutes.  A Level II suicide watch is where the inmate is still observed every fifteen minutes, but the inmate would have access

---

[1] All Exhibits referenced herein are attached to PrimeCare Medical Defendants' Statement of Undisputed Facts.

to clothing, toiletries and a blanket.  (Exhibit F, p. 34, lines 1-19.)  Only a psychiatrist could move inmates from Level I to Level II and then Level III.  (Exhibit F, p. 27, lines 21-22.)  A Level III was considered a mental health watch, and Ms. Pitoniak was able to remove an inmate from that status.  (Exhibit F, p. 28, lines 2-5.)

Ms. Pitoniak evaluated Mr. Alexander on April 26, 27, and 28, 2011, while he was on Level I precautions.  Mr. Alexander denied suicidal ideation during all three evaluations. (Exhibit E, pp. 2-3.)

Mr. Alexander was evaluated by Dr. Alex Thomas on April 30, 2011. (Exhibit E, p. 3.) Dr. Alex T. Thomas is a psychiatrist who graduated from Trivandrum Medical School at Kerala University in India in 1982.  He has been licensed to practice medicine in the Commonwealth of Pennsylvania since 1988.  See, Exhibit G, p. 6, lines 4-21.  Dr. Thomas has a contract with PrimeCare which includes Dr. Thomas providing psychiatric services to inmates incarcerated at MCCF.  (Exhibit G, p. 9, lines 4-15.)

Dr. Thomas evaluated Mr. Alexander on April 30, 2011, because Ms. Pitoniak placed Mr. Alexander on the list to be evaluated due to the suicide watch status.  (Exhibit G, p. 12, lines 2-9.)  Mr. Alexander did not have any suicidal ideation during this evaluation with Dr. Thomas.  Dr. Thomas' plan was to decrease the suicide watch from Level I to Level II, to prescribe Remeron 15 mg. at bed time, and for Mr. Alexander to follow up with Dr. Dedania. (Exhibit G, p. 14, lines 1-13.)  Dr. Thomas had no further personal contact with Mr. Alexander. (Exhibit E.)

Ms. Pitoniak evaluated Mr. Alexander on May 2, May 3, and May 5, 2011 (Exhibit E, p. 6.)  Mr. Alexander reported to Ms. Pitoniak that he was feeling better, and there was no indication that Mr. Alexander was suicidal during these evaluations.  (Exhibit E, p. 6.)

Dr. Kishorkumar Dedania is a board certified psychiatrist who graduated from medical school in India in the 1980s.  (Exhibit H, p. 5, line 23 through p. 6, line 19.)  Dr. Dedania has a contract with PrimeCare to provide psychiatric services to inmates in MCCF. (Exhibit H, p. 6, line 17 through p. 7, line 1.)

Dr. Dedania evaluated Mr. Alexander on the following days during the relevant incarceration:  May 7, 2011; May 14, 2011, June 4, 2011, July 2, 2011, and July 10, 2011. (Exhibit H, p. 8, line 21 through p. 9, line 2.)  On May 7, 2011, Dr. Dedania evaluated Mr. Alexander and noted that Mr. Alexander was complaining of not sleeping and feeling anxious and paranoid, as well as that his medications were not working.  In utilizing his education, training and experience, Dr. Dedania did not assess Mr. Alexander as being either suicidal, homicidal, or psychotic.  (Exhibit H, p. 9, lines 13-24.)  Thus, Dr. Dedania used his judgment to reduce suicide precautions to a Level III.  (Exhibit H, p. 9, lines 23-24.) Dr. Dedania also modified Mr. Alexander's medications by discontinuing Remeron, but starting Sinequan 100 mg. at bedtime for 90 days.  (Exhibit H, p. 10, lines 1-7.)

Ms. Pitoniak evaluated Mr. Alexander on May 9, 2011, because Mr. Alexander was upset about his friend dying.  No suicidal ideation was noted.  She again evaluated Mr. Alexander on May 10, 2011.  Mr. Alexander indicated he was doing much better, had no suicidal ideation, was calm, and had contracted for safety.  Consequently, Ms. Pitoniak utilized her professional judgment and discontinued the Level III watch.  (Exhibit E, p. 7.)

Dr. Dedania next evaluated Mr. Alexander a week later on May 14, 2011.  (Exhibit H, p. 10, lines 16-18.)  Mr. Alexander complained of feeling anxious and restless after he allegedly found out his daughter was to be put up for adoption.  (Exhibit H, p.10, line 22 through p. 11, line 4.)  As an aside, Mr. Alexander did not have any children.  Dr. Dedania

found that Mr. Alexander was not suicidal, homicidal or psychotic.   However, he did prescribe Ativan 1 mg three times per day.  (Exhibit H, p. 11, lines 2-3.)

Mr. Alexander submitted a sick call request on May 24, 2011, seeking to speak with Ms. Pitoniak "about something personal going on.  Has nothing to do with MEDS."  The response to the sick call indicates that Ms. Pitoniak saw Mr. Alexander on May 25, 2011. (Exhibit I.)

Mr. Alexander submitted another sick call request on May 25, 2011, which was received in the medical department on May 26, 2011.  (Exhibit I.)  Ms. Pitoniak evaluated Mr. Alexander on May 26, 2011.  (Exhibit E, p. 9.)  Mr. Alexander claimed to be feeling a bit paranoid.  He had no suicidal or homicidal ideation.  Ms. Pitoniak's assessment was that Mr. Alexander appeared fine and follow up was to occur as needed.  (Exhibit E, p. 9.)

Ms. Pitoniak evaluated Mr. Alexander on June 3, 2011, because Mr. Alexander was upset that his girlfriend's daughter passed away.  (Exhibit E, p. 9.)  Mr. Alexander was not suicidal, but Ms. Pitoniak referred Mr. Alexander to the psychiatrist for a medication review. (Exhibit E, p. 9.)

Dr. Dedania followed up with Mr. Alexander the next day, on June 4, 2011.  Mr. Alexander complained of feeling nervous, anxious, paranoid and depressed, but was not suicidal or homicidal.  He was prescribed the following medications:  Thorazine – 50 mg. in the morning and 100 mg. at bed time; Ativan – 1 mg. three times per day; and Paxil – 20 mg. in the morning.  (Exhibit H, p. 14, lines 9-22.)

On June 27, 2011, Mr. Alexander submitted a sick call request concerning his medications and feeling unsafe, paranoid, agitated, and uneasy during the hours 2:00 p.m. to 8:00 p.m. (Exhibit I.)  Mr. Alexander was seen in the medical department on June 28,

2011, and he was noted as being anxious and paranoid.  He had no suicidal or homicidal ideation, and he contracted for safety.  (Exhibit E, p. 11.)

Ms. Pitoniak evaluated Mr. Alexander on June 29, 2011.  (Exhibit E, p. 11.)  Mr. Alexander reported having a difficult time dealing with anxiety and depression mostly in the afternoon (Exhibit E, p. 11.)  He was not suicidal or homicidal, and he contracted for safety (Exhibit E, p. 11.)  Ms. Pitoniak referred Mr. Alexander to the next psychiatrist line.  (Exhibit E, p. 11.)

Per the referral of Ms. Pitoniak, Dr. Dedania's next evaluation of Mr. Alexander was on July 2, 2011.  (Exhibit H, p. 22, lines 6-7.)  At that time, Mr. Alexander complained about feeling paranoid and anxious, but that the medicine was helping but not all the time.  He was not suicidal or homicidal.  Dr. Dedania increased the Thorazine to 50 mg. in the morning, 50 mg. at 1:00 p.m., and 100 mg. at night.  (Exhibit H, p. 22, lines 10-18.)

At approximately 10:00 p.m. on the evening of Friday, July 8, 2011, Mr. Alexander reported to Nurse Sutton that he was having increased paranoid thinking and that he believed someone was out to get him.  This spurred Nurse Sutton to call Ms. Pitoniak at home, and Ms. Pitoniak spoke to Mr. Alexander the night of July 8, 2011, via telephone. (Exhibit E, pp. 12-13.)  After speaking with Mr. Alexander, Ms. Pitoniak instructed Nurse Sutton to place Mr. Alexander on the next psychiatrist line.  (Exhibit E, pp. 12-13 and Exhibit F, p. 64 line 14 through p. 65 line 11.)

Dr. Dedania evaluated Mr. Alexander on July 10, 2013.  Mr. Alexander complained of feeling paranoid and anxious.  He had no suicidal, homicidal ideation or depression.  Dr. Dedania adjusted Mr. Alexander's medication by increasing the Thorazine to 100 mg. three times per day, and Paxil to 40 mg. in the morning.  The Ativan was to continue at 1 mg. three times per day. (Exhibit H, p. 24, lines 2-12.)  Dr. Dedania testified during his

deposition that he did not place Mr. Alexander on suicide precautions on July 10, 2011, because, "According to my clinical interview with him and knowledge he had not expressed any suicidal ideations and there was no indication for me to put him on suicide watch." (Exhibit H, p. 25, lines 16-21).

Ms. Pitoniak evaluated Mr. Alexander on July 11, 2011.  (Exhibit E, pp. 12-13.)  Mr. Alexander indicated to Ms. Pitoniak that he felt a bit better and he was not suicidal or homicidal.  Follow up was to occur as needed.  (Exhibit E, p. 13.)  At no time thereafter was Mr. Alexander deemed suicidal or at risk for suicide by the medical or mental health staff.  Mr. Alexander hung himself on July 19, 2011.

The Medical Administration Record (MAR) documents the prescription, time for dose, and when the medication was provided to the inmate.  See, Exhibit J.  Medications are provided to inmates by nursing staff.  The MAR confirms that Mr. Alexander was consistently provided his medications during the months leading up to his suicide.  (Exhibit J.)

Plaintiff has produced an expert report from Edward J. Barbieri, Ph.D., who is a toxicologist.  See, Exhibit K.  Dr. Barbieri opines that the toxicology results taken at autopsy indicate Mr. Alexander's whole blood concentration was consistent with the prescribed doses of Sinequone and Paxil.  (Exhibit K, p. 7.)  Dr. Barbieri cannot opine as to whether there was Ativan in Mr. Alexander's blood at the time of autopsy.

## II. ISSUES

A.   SHOULD THIS HONORABLE COURT ENTER SUMMARY JUDGMENT IN FAVOR OF PRIMECARE WHERE PLAINTIFF CANNOT DEMONSTRATE A RECKLESS INDIFFERENCE TO MR. ALEXANDER'S MENTAL HEALTH NEEDS?

B.   SHOULD THIS HONORABLE COURT STRIKE PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES?

7

C.    SHOULD THIS HONORABLE COURT DISMISS PLAINTIFF'S CAUSE OF ACTION FOR NEGLIGENCE FOR LACK OF JURISDICTION?

Suggested Answer to All: Yes

### III. ARGUMENT

Federal Rule of Civil Procedure 56 governs motions for summary judgment, and section (c) of the Rule states in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of any material fact and that the moving party is entitled to judgment as a matter of law.

The United States Supreme Court has stated:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  Celotex v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

There is an issue of material fact only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,248, 106 S.Ct. 993, L.Ed.2d 176 (1986).  A plaintiff must "point to concrete evidence in the record that supports each and every essential element of his case" to survive summary judgment.  Orsatti v. New Jersey State Police, 71 F.3d 480,484 (3rd Cir. 1995).

**A.    SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF PRIMECARE TO COUNTS IV AND V SINCE PLAINTIFF DOES NOT HAVE EVIDENCE TO SUPPORT RECKLESS INDIFFERENCE.**

The Third Circuit has recognized that the suicide of a pretrial detainee can support a recovery in a 42 U.S.C. § 1983 action.  Colburn v. Upper Darby Township, 946 F.2d 1017, 1023-1025 (3d Cir. Pa. 1991).  *See also*, Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir. 1989); Freedman v. Allentown, 853 F.2d 1111 (3d Cir. 1988).  The standard of liability to be applied in this circuit in prison suicide cases is that "if [custodial] officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." Colburn, 946 F.2d 1023 (internal citations omitted).

A plaintiff in a prison suicide case has the burden of establishing three elements:  (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability.  Id.

Reckless or deliberate indifference is articulated in Estelle v. Gamble, 429 U.S. 97, 50 L. Ed. 2d 251, 97 S. Ct. 285 (1976).  Estelle involved Eighth Amendment claims alleging inadequate medical treatment.  The Court held that prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit "deliberate indifference to serious medical needs of prisoners."  Id., at 104.  The standard enunciated in Estelle "requires [both that there be] deliberate indifference on the part of the prison officials and [that] the prisoner's medical needs . . . be serious." Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987).

A serious medical need, as developed in Estelle, has two components.  The detainee's condition must be such that a failure to treat can be expected to lead to

substantial and unnecessary suffering, injury, or death.  Moreover, the condition must be "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth, 834 F.2d at 347 (internal citations omitted).

In Colburn v. Upper Darby Township, 838 F.2d 663, 664 (3d Cir. Pa. 1988), the Third Circuit recognized that  "particular vulnerability to suicide" represents a "serious medical need."  However, the Third Circuit has recognized that neither the due process clause nor the Eighth Amendment imposes liability for a negligent failure to protect a detainee from self-inflicted injury.  Id.  A higher level of culpability, one involving "reckless or deliberate indifference," is required.  See also, Colburn, 946 F.2d at 1023-1025 (3d Cir. Pa. 1991). Therefore, it is clear that a level of culpability higher than a negligent failure to protect from self-inflicted harm is required.  Id., at 1024.

The requirement of a "particular vulnerability to suicide" speaks to the degree of risk inherent in the detainee's condition.  Id.  The requirement of "reckless or deliberate indifference" implies that there must be "a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur."  Id. (internal citations omitted).  Even where a strong likelihood of suicide exists, it must be shown that the custodial officials "knew or should have known" of that strong likelihood.  Id.  There can be no reckless or deliberate indifference to that risk unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide.  Id.

Guided by these standards, it is clear that Plaintiff cannot present sufficient evidence to a jury to support deliberate indifference to a serious medical condition or a particular vulnerability to suicide.  Mr. Alexander received continuous mental health treatment during his incarceration.  This included approximately nineteen evaluations by Ms. Pitoniak and the

psychiatrists between the time of intake and Mr. Alexander's suicide. He was continually provided medication to address his mental health needs, and those medications were adjusted by the psychiatrists as clinically required. At any point that Mr. Alexander sought mental health treatment, he was promptly provided treatment as shown by the responses to the sick call slips. At no point after he was removed from suicide precautions on May 7, 2011, by Dr. Dedania did any of the medical professionals at MCCF believe Mr. Alexander to be suicidal or have a particular vulnerability to suicide. Moreover, Mr. Alexander received his medications throughout his incarceration, and Plaintiff's expert opines that Sinequon and Paxil were in his system as prescribed at autopsy, and he cannot give any opinion as to the Ativan.

The record in this case is clear that Mr. Alexander received an extensive amount of treatment for his mental health condition. There was never a belief that he was suicidal after May 7, 2011. Moreover, he continually received medications which were monitored and adjusted consistent with his clinical presentation. Therefore, it is respectfully submitted that Plaintiff cannot demonstrate a reckless indifference to a particular vulnerability of suicide in this case. Thus, PrimeCare respectfully requests that Plaintiff's causes of action in Counts IV and V be dismissed with prejudice.

### B.   PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES SHOULD BE STRICKEN.

As stated above, Plaintiff cannot demonstrate a cause of action for an alleged violation of his constitutional rights. However, there remains a claim for negligence, and a demand for punitive damages.

Pennsylvania's Medical Care Availability and Reduction of Error (MCARE) Act allows punitive damages to be awarded "for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others." 40 P.S. §

1303.505(a); and <u>see</u>, <u>MacLeod v. Russo</u>, 2010 Pa. Dist. & Cnty. Dec. LEXIS 219, 5 (Monroe Co. 2010) (noting that under MCARE, "even gross negligence is not insufficient to support punitive damages against a healthcare provider"). The MCARE Act also states, however, that "Punitive damages shall not be awarded against a health care provider who is only vicariously liable for the actions of its agent that caused the injury unless it can be shown by a preponderance of the evidence that the party knew of and allowed the conduct by its agent that resulted in the award of punitive damages."  40 P.S. § 1303.505(c); and, <u>see</u>, <u>generally</u>, <u>Stroud v. Abington Mem. Hosp.</u>, 546 F. Supp. 2d 238, 259 (E.D. Pa. 2008) (noting that "[t]o state a claim for punitive damages against a hospital based on vicarious liability, the plaintiff must plead and ultimately prove 'by a preponderance of the evidence that the party knew of and allowed the conduct by its agent that resulted in the award of punitive damages'").

In this matter, Plaintiff's claims against PrimeCare are based on vicarious liability. Plaintiff has not pleaded nor produced evidence to support a finding that PrimeCare knew of and allowed the conduct of employees/agents that might give rise to an award of punitive damages.  To the contrary, the record clearly reveals that PrimeCare's agents and employees provided mental health treatment to Mr. Alexander to address his needs. Therefore, it is respectfully requested that this Honorable Court strike Plaintiff's claim for punitive damages arising from any alleged negligence.

## C.    PLAINTIFF'S CLAIM FOR NEGLIGENCE SHOULD BE DISMISSED FOR LACK OF JURISDICTION.

Plaintiff alleges federal question jurisdiction exists for the claims he raises under the Fourteenth Amendment and 42 U.S.C.A. § 1983.  Plaintiff further alleges that this Court has supplemental jurisdiction for the state court negligence claim.  As stated above, it is

submitted that Plaintiff cannot demonstrate that there was any violation of Mr. Alexander's constitution.  Thus, the only remaining claim against PrimeCare would be for negligence.

28 U.S.C.S. § 1367 provides "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  Despite this grant of supplemental jurisdiction, the District Courts "may decline to exercise supplemental jurisdiction over a claim" if any of the following factors are met:

> (a)     the claim raises a novel or complex issue of State law,
>
> (b)     the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (c)     the district court has dismissed all claims over which it has original jurisdiction, or
>
> (d)     in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C.S. § 1367(c).

"A federal district court must continually re-evaluate the alleged basis for its jurisdiction throughout the course of the litigation.  As such, there is no time bar to challenging jurisdiction during the pendency of the action. Indeed, 28 U.S.C. § 1447(c) provides, in pertinent part, as follows: '(i)f *at any time before final judgment* it appears that the district court lacks subject matter jurisdiction, the case *shall be remanded*.'"  Fleeman v. Toyota Motor Sales, 288 F. Supp. 2d 726, 728 (S.D. W. Va. 2003), *emphasis in original.* The relevant case law supports declining to exercise supplemental jurisdiction when federal claims have been dismissed. See, Carnegie Mellon University v. Cohill, 484 U.S. 343, 350 (1988) (instructing that courts should ordinarily decline to exercise supplemental jurisdiction

in the absence of federal claims).  See, also, Goodwin v. Seven-Up Bottling Co., 1996 U.S. Dist. LEXIS 15448 (E.D. Pa.  1996).  Further, district courts have previously declined to exercise its supplemental jurisdiction when only a state law medical malpractice claim remained recognizing that such a claim is "a claim with which the state court has more familiarity."  Diaz-Ferrante v. Rendell, 1998 U.S. Dist. LEXIS 5391, 20 (E.D. Pa. Mar. 30, 1998).  See, also, Harris v. Pennsylvania, 2014 U.S. Dist. LEXIS 31072 (E.D. Pa. 2014). Other courts have also recognized that professional negligence claims are more appropriately heard in State Court.  In Gallo v. Wash. County, 2009 U.S. LEXIS 7958 (W.D. Pa. Feb 4, 2009), the Court noted "[t]he remaining claims are brought by a Pennsylvania resident and relate to alleged professional negligence of Pennsylvania doctors and medical personnel. The state court generally handles such cases and has substantial expertise in such cases."  The Court went on to hold, "[t]here being no 'exceptional' reason why the Court should retain this case involving only a state claim, the Court will dismiss the professional negligence count without prejudice for said claim to be re-filed in state court." The same analysis should be adopted in the instant matter.  Finally, courts have recognized there is a "local interest in deciding local controversies at home" and have held this interest "promotes the interest of justice."  Imani v. U-Haul Int'l, 2007 U.S. Dist. LEXIS 64971, 15, (E.D. Pa. Sept. 4, 2007).  The residents of Monroe County have a greater interest in deciding matters relating to the medical care provided in the local prison than the jurors within this Court's scope.

Thus, if all federal question claims have been resolved and only state law claims remain, exercising supplemental jurisdiction would result in a trial wherein only state law claims are presented.  Further, the Court of Common Pleas has greater expertise in handling state law malpractice and professional negligence claims.  The Court of Common

Pleas of Monroe County also has a greater interest in resolving a dispute regarding the medical care rendered in its local prison than the District Court.  Therefore, it is respectfully requested that this Honorable Court decline to exercise jurisdiction over any remaining state law causes of action and the case be dismissed from this Court.

Respectfully submitted,

JOHNSON, DUFFIE, STEWART & WEIDNER

By:___s/John R. Ninosky_____
      John R. Ninosky, Esquire
      Attorney I.D. No. 78000
      301 Market Street ~ P.O. Box 109
      Lemoyne, PA  17043-0109
      Telephone (717) 761-4540
      Email:  jrn@jdsw.com

Date:  January 22, 2016      Counsel for PrimeCare Medical Defendants
745755

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on 22nd day of January, 2016, I electronically filed the foregoing

*Brief in Support of Motion for Summary Judgment* with the Clerk of Court using the CM/ECF

system which will send notification of such filing to the following:

James A. Swetz, Esquire
Cramer, Swetz, McManus & Jordan, P.C.
711 Sarah Street
Stroudsburg, PA  18360
jaswetz@csmjlawyer.com
*Counsel for Plaintiff*

Mark T. Perry, Esquire
John R. Hill, Esquire
The Perry Law Firm, LLC
87 South Commerce Way, Suite 740
Bethlehem, PA  18017
mtp@theperrylawfirm.com
jrh@theperrylawfirm.com
*Counsel for Dr. Alex T. Thomas*

Gerard J. Geiger, Esquire
Newman, Williams, Mishkin,
   Corveleyn, Wolfe & Fareri
712 Monroe Street
Stroudsburg, PA  18360
ggeiger@newmanwilliams.com
*Counsel for Monroe County Defendants*

Thomas L. Mueller, Esquire
Lubell & Associates, P.C.
1012 West 9th Avenue, Suite 220
King of Prussia, PA  19406
tmueller@lubellassociates.com
*Counsel for Dr. Dedania*

JOHNSON, DUFFIE, STEWART & WEIDNER

By:      s/John R. Ninosky
         John R. Ninosky