# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DEBRA L. ALEXANDER, adoptive parent and Administratrix of the Estate of Scott Alonzo Alexander,

    Plaintiff,

    v.

MONROE COUNTY, et al.,

    Defendants.

CIVIL ACTION NO. 3:13-cv-01758

(KOSIK, J.)
(SAPORITO, M.J.)

## REPORT AND RECOMMENDATION

This is a federal civil rights action for damages, brought under 42 U.S.C. § 1983, arising from the death by suicide of Scott Alonzo Alexander on July 21, 2011. In the months leading up to his death, he had been an inmate at the Monroe County Correctional Facility, located in Monroe County, Pennsylvania. The plaintiff is Debra L. Alexander, the decedent's adoptive parent and the Administratrix of his estate.

## I. BACKGROUND

Alexander, the decedent, was arrested and incarcerated on April 24, 2011, as a pretrial detainee in the Monroe County Correctional Facility. At the time of his arrest, he was under parole supervision for a prior offense.

Upon incarceration, Alexander was placed on "Level I" suicide watch. On April 30, 2011, he was reduced to a "Level II" suicide watch. On May 7, 2011, he was reduced to a "Level III" mental health watch. On May 10, 2011, he was removed from mental health watch, but he continued to be evaluated periodically by a psychiatrist and a mental health clinician. On July 18, 2011, Alexander's parole was revoked and he was remanded to Monroe County Correctional Facility to serve the remainder of the sentence for which he had been paroled. On July 19, 2011, Alexander hanged himself, using a bedsheet tied to a bunkbed frame in his cell. Alexander was hospitalized and remained unresponsive until his death on July 21, 2011.

The plaintiff initiated this civil action by filing her original complaint on June 25, 2013. (Doc. 1). The plaintiff filed an amended complaint on September 13, 2013. (Doc. 17). She filed her second amended complaint—currently the operative complaint in this action—on November 5, 2013. (Doc. 37). In her six-count second amended complaint, the plaintiff alleged that each of the defendants violated the decedent's constitutional rights under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and that the medical

defendants are liable for medical negligence under state law.

On July 25, 2014, the Court dismissed Count III of the second amended complaint, which asserted a § 1983 claim against Monroe County with respect to its funding and supervision of the county public defender's office, and all constitutional tort claims to the extent they were based on violation of the decedent's Fifth or Fourteenth Amendment rights. (Doc. 65; Doc. 66). The plaintiff's remaining Eighth Amendment and state-law claims were permitted to proceed to discovery. (Doc. 65; Doc. 66).

The defendants now move for summary judgment on all of these remaining claims. (Doc. 99; Doc. 106; Doc. 109; Doc. 112).

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving

party." *Anderson*, 477 U.S. at 248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52.

In evaluating a motion for summary judgment, the Court must first determine if the moving party has made a *prima facie* showing that it is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a);

*Celotex*, 477 U.S. at 331.

Both parties may cite to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a *form* which is inadmissible at trial, the *content* of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III.    MATERIAL FACTS

Alexander was arrested and incarcerated on April 24, 2011, as a pretrial detainee in the Monroe County Correctional Facility. At the

time of his arrest, he was under parole supervision for a prior offense. Upon intake at the jail, Alexander was screened for suicide risk pursuant to an established suicide-prevention policy, originally adopted in 1990 and most recently revised in 2009. (*See generally* Doc. 113-1).

PrimeCare Medical, Inc. ("PrimeCare") is a private corporation that contracted with Monroe County to provide medical and mental health care to inmates at the Monroe County Correctional Facility. In addition to the jail policy, PrimeCare had itself adopted a suicide-prevention policy, under which Alexander was also screened. (*See generally* Doc. 100-1, at 8–12).

Upon his intake at Monroe County Correctional Facility, Alexander was placed on Level I suicide watch[1] because the arresting officers had reported that he had put a gun in his mouth and threatened suicide during a confrontation with police immediately prior to his arrest, and because he had a history of suicide threats and attempts,

---

[1] An inmate on Level I suicide watch is observed by security staff every fifteen minutes, his clothing and bedding is removed from his cell and he is provided with a suicide smock and suicide blanket only, and he receives only finger foods to eat. Only a psychiatrist or his designee can reduce an inmate from Level I suicide watch to Level II suicide watch.

including an earlier period of incarceration at Monroe County Correctional Facility.[2]

On April 26, 2011, non-party Jennifer Pitoniak, LSW,[3] met with and evaluated Alexander. (Doc. 109-2, at 15). In her treatment notes, Pitoniak noted that Alexander reported having felt "very paranoid" prior to his arrest. (*Id.*). He wanted to see his father, but when he was unable to do so, he held a gun to his head and threatened to hurt himself. (*Id.*). When questioned by Pitoniak, Alexander denied any current suicidal or homicidal thoughts, plans, or intent. (*Id.*). Pitoniak found no present signs of psychosis. (*Id.*). She advised Alexander that she would follow up with him the next day. (*Id.*).

On April 27, 2011, Pitoniak met with and evaluated Alexander. (*Id.*). In her treatment notes, Pitoniak noted that Alexander had said he

---

[2] In her counter-statement of material facts to Dr. Thomas's motion, the plaintiff notes that, after his arrest but before his admission to Monroe County Correctional Facility, Alexander was taken to Pocono Medical Center.

[3] Pitoniak is a licensed social worker employed with PrimeCare as a mental health clinician, providing inmates with therapeutic treatment of mental health conditions, including individual and group therapy, mental health assessments, suicide-prevention screenings, and other activity intended to facilitate psychiatric treatment.

was "doing ok," and that he had no current suicidal or homicidal ideation. (*Id.*). She did observe, however, that Alexander "appear[ed] paranoid." (*Id.*). She advised Alexander that she would follow up with him the next day. (*Id.*).

On April 28, 2011, Pitoniak met with and evaluated Alexander. (*Id.* at 16). In her treatment notes, Pitoniak observed that Alexander was "clear [and] cooperative today," and she found no suicidal or homicidal ideation. (*Id.*).

On April 30, 2011, defendant Dr. Alex T. Thomas[4] met with and evaluated Alexander. (Doc. 109-2, at 16; Doc. 109-3, at 13–15). Alexander had been on Level I suicide watch. Dr. Thomas observed that Alexander looked well and exhibited a "mildly anxious" mood with appropriate affect, but he found "no current suicidal or homicidal thoughts or plans, no overt psychotic symptoms, no gross cognitive deficits," and that Alexander was "friendly and cooperative, [and] wants to live for his family[,] especially the kid that might be his." (Doc. 109-2,

---

[4] Thomas is a licensed physician who specializes in psychiatry. He contracted with PrimeCare to provide psychiatric services to inmates at the jail. He has been a consulting psychiatrist at Monroe County Correctional Facility for more than ten years.

at 16; Doc. 109-3, at 14–15). Dr. Thomas noted that Alexander complained of not sleeping for days. (Doc. 109-2, at 16; Doc. 109-3, at 15). His clinical impression of Alexander was that of "psychosis induced by ecstasy and marijuana." (Doc. 109-2, at 16; Doc. 109-3, at 15). He directed that Alexander be reduced to Level II suicide watch,[5] with no need for psychiatric medications, and he prescribed that Alexander receive Remeron 15 milligrams at bedtime for 90 days for his sleep issues and a follow-up psychiatry appointment with Dr. Dedania the following week.[6] (Doc. 109-2, at 16; Doc. 109-3, at 15). Dr. Thomas did not see Alexander again before his death. (Doc. 109-3, at 15).

On May 2, 2011, Pitoniak met with and evaluated Alexander. (Doc. 109-2, at 17). Alexander reported "feeling a little better," and he denied any suicidal or homicidal ideation. (*Id.*).

On May 3, 2011, Pitoniak met with and evaluated Alexander. (*Id.*). He reported "feeling much better," and he once again denied any

---

[5] An inmate on Level II suicide watch is still observed by security staff every fifteen minutes, but is given access to clothing, toiletries, and a blanket. Only a psychiatrist or his designee can reduce an inmate from Level II suicide watch to Level III mental health watch.

[6] Apparently, Dr. Thomas and Dr. Dedania alternated workweeks, so a one-week follow-up appointment would necessarily be with Dr. Dedania.

suicidal or homicidal ideation. (*Id.*).

On May 5, 2011, Pitoniak met with and evaluated Alexander. (*Id.*). Alexander reported "feeling fine," and he denied any suicidal or homicidal ideation. (*Id.*).

On May 7, 2011, defendant Dr. Kishorkumar G. Dedania[7] met with and evaluated Alexander for the first time. In his treatment notes, Dr. Dedania reported that Alexander presented with complaints "about not sleeping, feeling anxious and paranoid," and Alexander reportedly felt that his "meds [were] not helping." (Doc. 109-1, at 10; Doc. 109-2, at 18). Based on his examination of Alexander, Dr. Dedania found "[n]o suicidal, homicidal ideation or psychosis." (Doc. 109-1, at 10; Doc. 109-2, at 18). Dr. Dedania reduced Alexander from Level II suicide watch to Level III mental health watch.[8] (*Id.*). He discontinued Remeron—a medication prescribed by Dr. Thomas one week earlier that Alexander

---

[7] Dedania is a licensed physician who is board-certified in psychiatry. He contracted with PrimeCare to provide psychiatric services to inmates at the jail. He has been a consulting psychiatrist at Monroe County Correctional Facility for more than fifteen years.

[8] An inmate on Level III mental health watch is still observed by security staff every thirty to sixty minutes, with no other special restrictions. Only a psychiatrist or his designee can discontinue an inmate from Level III mental health watch.

felt wasn't working—and started him on Sinequan 100 milligrams at bedtime for 90 days. (*Id.* at 11). Dr. Dedania did not consult with Dr. Thomas before making this decision, nor did he communicate with Dr. Thomas about Alexander after he began treating Alexander on May 7, 2011. (*Id.* at 11, 14).

On May 9, 2011, Pitoniak met with and evaluated Alexander. She found no suicidal or homicidal ideation. (Doc. 109-2, at 18).

On May 10, 2011, Pitoniak met with and evaluated Alexander. In her treatment notes, she reported that Alexander stated that he was "much better" and she found no suicidal or homicidal ideation. (*Id.*). Alexander contracted for safety,[9] and Pitoniak reported his demeanor as "calm." (*Id.*). She discontinued Alexander from Level III mental health watch. (*Id.*). She did not consult with Dr. Thomas or Dr. Dedania about this decision. (Doc. 109-4, at 40; *see also* Doc. 109-1, at 15).

On May 14, 2011, while serving as the on-call psychiatrist for the week, Dr. Thomas was consulted by telephone by a nurse who described

---

[9] A "'[c]ontract for safety' is 'essentially an agreement to seek help before acting on a suicidal impulse.'" *Keohane v. Lancaster Cty.*, Civil Action No. 07-3175, 2010 WL 3221861, at *3 n.5 (E.D. Pa. Aug. 13, 2010) (quoting medical literature).

Alexander as anxious and shaking. (Doc. 109-2, at 19; *see also* Doc. 109-1, at 13–14). Dr. Thomas prescribed an anti-anxiety drug, Ativan, for Alexander. (Doc. 108, at 3; Doc. 109-2, at 19).

Later that same day—May 14, 2011—Dr. Dedania met with and evaluated Alexander. (Doc. 109-1, at 11–12; Doc. 109-2, at 19). In his treatment notes, Dr. Dedania reported that Alexander had been complaining about feeling anxious and restless after he learned that his daughter would be put up for adoption. (Doc. 109-1, at 11–12; Doc. 109-2, at 19). Dr. Dedania found no suicidal or homicidal ideation, nor any psychosis. (Doc. 109-1, at 12; Doc. 109-2, at 19). Dr. Dedania modified Alexander's prescriptions to include both Ativan and Sinequan, and he recommended a follow-up visit in two weeks. (Doc. 109-1, at 12; Doc. 109-2, at 19).

On May 26, 2011, Pitoniak met with and evaluated Alexander. (Doc. 109-2, at 19; Doc. 109-4, at 44). She reported that Alexander stated that he was "still feeling a bit paranoid," but she found no suicidal or homicidal ideation. (Doc. 109-2, at 19). Alexander once again contracted for his safety. (*Id.*).

On June 3, 2011, Pitoniak met with and evaluated Alexander.

(Doc. 109-2, at 20; Doc. 109-4, at 45). She reported that Alexander was "very upset" because his girlfriend's daughter had passed away the previous night. (Doc. 109-2, at 20). Nevertheless, she found no suicidal or homicidal ideation, and Alexander contracted for safety once again. (*Id.*).

On June 4, 2011, Dr. Dedania met with and evaluated Alexander. (Doc. 109-1, at 15, Doc. 109-2, at 21). In his treatment notes, Dr. Dedania reported that Alexander was "complaining about feeling nervous, anxious, paranoid[,] and depressed." (Doc. 109-1, at 15). Alexander told Dr. Dedania that his girlfriend's daughter had died recently, so he was under a lot of stress. (*Id.*). Nevertheless, Dr. Dedania found no suicidal or homicidal ideation. (*Id.*). Dr. Dedania prescribed Thorazine, Ativan, and Paxil, and he recommended a follow-up visit in one month. (*Id.*).

On June 28, 2011, non-party Barbara Williams, a licensed practical nurse, met with and evaluated Alexander. (Doc. 109-2, at 22). Alexander reported to Williams that he had been feeling anxious and paranoid. (*Id.*). Williams found no suicidal or homicidal ideation, and Alexander contracted for safety again. (*Id.*).

On June 29, 2011, Pitoniak met with and evaluated Alexander. (Doc. 109-2, at 22). In her treatment notes, she reported that Alexander said he was having a difficult time dealing with his anxiety and depression, mostly in the afternoon. (*Id.*). He further advised her than he had been experiencing paranoia and visual hallucinations, but he denied any suicidal or homicidal ideation. (*Id.*). Alexander contracted for his safety once again. (*Id.*). Pitoniak noted that Alexander did not appear to be psychotic. (*Id.*) She referred him to the psychiatrist for further evaluation. (*Id.*).

On July 2, 2011, Dr. Dedania met with and evaluated Alexander. (Doc. 109-1, at 23; Doc. 109-2, at 22). In his treatment notes, Dr. Dedania reported that Alexander complained about feeling paranoid and anxious, but denied any suicidal or homicidal ideation. (Doc. 109-1, at 23; Doc. 109-2, at 22). Alexander advised Dr. Dedania that he felt the medicine had been helping, but not all the time. (Doc. 109-1, at 23; Doc. 109-2, at 22). Dr. Dedania increased Alexander's Thorazine dosage and continued Alexander on his other medications at the same dosages. (Doc. 109-1, at 23; Doc. 109-2, at 22). Dr. Dedania recommended a follow-up visit in three months. (Doc. 109-1, at 23; Doc. 109-2, at 22).

On the evening of July 8, 2011, Alexander complained to a nurse, non-party Donna Sutton, that he had been experiencing increased paranoid thinking, and he requested that he be placed on the list to see a psychiatrist over the weekend. (Doc. 109-2, at 23–24).

On Sunday, July 10, 2011, Dr. Dedania met with and evaluated Alexander. (Doc. 109-1, at 24–25; Doc. 109-2, at 22). In his treatment notes, Dr. Dedania noted that Alexander had presented with complaints of increased anxiety and paranoid feelings. (Doc. 109-1, at 23; Doc. 109-2, at 22). Alexander advised Dr. Dedania that he did not believe his meds were helping, but he denied experiencing any depression or any suicidal or homicidal ideation. (Doc. 109-1, at 23; Doc. 109-2, at 25). Dr. Dedania increased Alexander's Thorazine and Paxil prescriptions, and he continued Alexander on his existing Ativan dosage. (Doc. 109-1, at 23; Doc. 109-2, at 22). Dr. Dedania recommended a follow-up visit in two months. (Doc. 109-1, at 23; Doc. 109-2, at 22).

On July 11, 2011, Pitoniak met with and evaluated Alexander. (Doc. 109-2, at 23–24). After meeting over the weekend with Dr. Dedania, who had increased Alexander's medication dosages, he reported to Pitoniak that he was "feeling a bit better." (*Id.*). Alexander

denied any suicidal or homicidal ideation. (*Id.*). Pitoniak observed no signs of psychosis. (*Id.*). Alexander once again contracted for his safety. (*Id.*). Pitoniak advised him to follow-up as needed. (*Id.*).

On July 18, 2011, Alexander's parole was revoked and he was remanded to Monroe County Correctional Facility to serve the remainder of the sentence for which he had been paroled. Later that same day, Alexander expressed an intention to kill himself to his girlfriend during a telephone call from the jail after his parole had been revoked. (Doc. 124-7, at 35). The telephone call was recorded, but there is no evidence in the record to affirmatively establish that any of the defendants monitored that call, listened to the recording, or otherwise learned of the content of Alexander's telephone conversation prior to his death by suicide.

On July 19, 2011, Alexander hanged himself, using a bedsheet tied to a bunkbed frame in his cell. (Doc. 113-3, at 4). He was discovered by his cellmate, who alerted defendant James Landon, a corrections officer on duty in the unit where Alexander was housed.[10] (*Id.* at 3, 5).

---

[10] Landon was performing "rover" duty at the time, filling in for the unit officer assigned to the male intake unit where Alexander was
*(continued on next page)*

The cellmate led Landon to Alexander's cell, where Landon observed Alexander with his feet hanging on the cell's lower bunk and his neck in a noose that was tied to the upper bunk. (*Id.* at 4). Landon ordered a lockdown and used his radio to call for rovers and medical assistance. (*Id.*). He entered the cell to assess Alexander's situation; he found no signs of breathing and no pulse. (*Id.*). Landon tried to lift Alexander up to relieve tension from the noose, but he received no response from Alexander. (*Id.*). Landon called on an inmate he knew to come in and lift Alexander up while Landon tried to get the noose off of Alexander's neck. (*Id.*).

Shortly after Landon called for help, several non-party corrections officers arrived to assist, and the inmate assistant returned to his cell for lockdown. (*Id.*; Doc. 124-11, at 6–8). The corrections officers removed the noose from around Alexander's neck and lay him on the floor to administer CPR. (Doc. 113-3, at 4; Doc. 124-11, at 27). Landon prepared to administer rescue breathing in alternation with another officer administering chest compressions, but Landon had been chewing gum. (Doc. 113-3, at 4). At his deposition, Landon testified that he attempted

---

housed so that officer could take a meal break.

to spit the gum out to his right-hand side, but it struck his arm and fell into Alexander's mouth.[11] (*Id.*). Landon attempted unsuccessfully to remove the gum from Alexander's mouth before the other officer completed a round of chest compressions, at which time Landon administered rescue breathing. (*Id.*). Landon testified that he saw Alexander's chest rise, indicating that Alexander had in fact received air. (*Id.*).

The corrections officers continued to administer CPR, rotating in to relieve each other as they tired from performing rescue breathing or chest compressions. Shortly after beginning CPR, they were joined by two non-party nurses employed by PrimeCare, Barbara Williams and Nurse Joyce. (Doc. 113-4, at 4, 11). Ultimately, Alexander was hospitalized and remained unresponsive until his death on July 21, 2011.

## IV.  DISCUSSION

In her six-count second amended complaint, the plaintiff alleged that each of the defendants violated the decedent's constitutional rights

---

[11] The plaintiff disputes Landon's account of events, which is discussed in greater detail below.

under the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, and that the medical defendants are liable for medical negligence under state law. On July 25, 2014, the Court dismissed Count III of the second amended complaint, which asserted a § 1983 claim against Monroe County concerning funding and supervision of the county public defender office, and all constitutional tort claims to the extent they were based on violation of the decedent's Fifth or Fourteenth Amendment rights. The plaintiff's remaining Eighth Amendment and state-law claims were permitted to proceed to discovery. The defendants now move for summary judgment on all of these remaining claims.

## A. Claims against Deborah Wilson and Wendy Johnson

First, we note that the second amended complaint named PrimeCare employees Deborah Wilson, D.O., and Wendy Johnson, L.P.N., as defendants to Counts V and VI.[12] In the PrimeCare defendants' summary judgment motion papers, counsel for these

_____

[12] The original, amended, and second amended complaints identify these defendants as "Dr. Debra Wilson" and "Wendi L. Johnson, L.P.N." (Doc. 1; Doc. 17; Doc. 37). In their answer to the second amended complaint, these defendants have clarified the correct spelling of their respective names, which we use here. (*See* Doc. 41 ¶¶ 8–9).

defendants has represented that "Plaintiff has agreed to dismiss any and all claims as to Dr. Wilson and Wendy Johnson." (Doc. 99 ¶ 6; *see also* Doc. 101, at 1). The plaintiff has not filed a Rule 41(a) notice or stipulation voluntarily dismissing these defendants, but she also has not disputed this representation by defense counsel in her motion papers—indeed, her motion papers fail to mention Wilson or Johnson by name at all, and she has failed to identify any evidence in the record to support a claim of any sort against these defendants. Under these circumstances, we find that the plaintiff has waived her claims against these two defendants, entitling them to summary judgment. *See Rife v. Borough of Dauphin*, 647 F. Supp. 2d 431, 442 & n.6 (M.D. Pa. 2009).

## B. Section 1983 / Eighth Amendment Claims

In Counts I, II, IV, and V, the plaintiff has asserted federal civil rights claims against each of the remaining defendants under 42 U.S.C. § 1983. Section 1983 provides a private cause of action with respect to the violation of federal constitutional rights. The statute provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States

> or any other person within the jurisdiction thereof to
> the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to
> the party injured in an action at law, suit in equity, or
> other proper proceeding for redress . . . .

42 U.S.C. § 1983. Section 1983 does not create substantive rights, but instead provides remedies for rights established elsewhere. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985). To establish a § 1983 claim, a plaintiff must establish that the defendant, acting under color of state law, deprived the plaintiff of a right secured by the United States Constitution. *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1141 (3d Cir. 1995).

The plaintiff claims that the defendants violated Alexander's Eighth Amendment right to be free from cruel and unusual punishment. The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "[P]rison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit 'deliberate indifference to serious medical needs of prisoners.'" *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991) (quoting

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Herman v. Cty. of York*, 482 F. Supp. 2d 554, 564 (M.D. Pa. 2007) (quoting *Estelle*, 429 U.S. at 105–06). "A particular vulnerability to suicide represents a serious medical need." *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) (citing *Colburn*, 946 F.2d at 1023).

> To be liable on a deliberate indifference claim, a defendant prison official must both "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." The knowledge element of deliberate indifference is subjective, not objective knowledge, meaning that the official must actually be aware of the existence of the excessive risk; it is not sufficient that the official should have been aware. However, subjective knowledge on the part of the official can be proved by circumstantial evidence to the effect that the excessive risk was so obvious that the official must have known of the risk. Finally, a defendant can rebut a prima facie demonstration of deliberate indifference either by establishing that he did not have the requisite level of knowledge or awareness of the risk, or that, although he did know of the risk, he took reasonable steps to prevent the harm from occurring.

*Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001) (quoting and citing *Farmer v. Brennan*, 511 U.S. 825, 837–38, 842, 844 (1994)) (citations omitted) (alterations in original). Thus, the Third Circuit instructs that:

> a plaintiff in a prison suicide case has the burden of establishing three elements: (1) the decedent had a

'particular vulnerability to suicide,' (2) the [defendants] knew . . . of that vulnerability, and (3) those [defendants] 'acted with reckless indifference' to the [prisoner's] particular vulnerability.

*Herman*, 482 F. Supp. 2d at 563 (quoting *Colburn*, 946 F.2d at 1023).[13]

We also note that, with respect to the medical defendants, "[w]hile the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990); *see also Herman*, 482 F. Supp. 2d at 564 (citing *Brown*). Thus, prison medical authorities are afforded "considerable latitude . . . in the diagnosis and treatment of the medical problems of inmate patients." *Inmates of Allegheny Cty. Jail v. Pierce*, 612 F.2d 754,

---

[13] In *Colburn*, the second element was originally formulated to inquire whether the defendant "knew or *should have known*" of the inmate's particular vulnerability to suicide, but the Supreme Court's subsequent decision in *Farmer v. Brennan*, 511 U.S. 825 (1994), clarified that the culpability required to support liability under the Eighth Amendment was *subjective* rather than objective—the defendant must actually know of and disregard an excessive risk to inmate health. *See Serafin v. City of Johnstown*, 53 Fed. App'x 211, 213–14 (3d Cir. 2002); *Herman*, 482 F. Supp. 2d at 564. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and *he must also draw the inference*." *Woloszyn*, 396 F.3d at 321 (emphasis added).

762 (3d Cir. 1979). "Mere medical malpractice cannot give rise to a violation of the Eighth Amendment." *White v. Napoleon*, 897 F.2d 103, 108 (3d Cir. 1990). The key question is whether the defendants provided the decedent with some type of treatment, regardless of whether it is what the plaintiff desires. *Farmer v. Carlson*, 685 F. Supp. 1335, 1339 (M.D. Pa. 1988).

### 1. Section 1983 Claims against Doctor Thomas

The plaintiff claims that Dr. Thomas was deliberately indifferent to the decedent's particular vulnerability to suicide based on his decision to reduce Alexander from Level I to Level II suicide watch on April 30, 2011, and based on his failure to reinstate Alexander to suicide watch at some point prior to his death by suicide on July 19, 2011.

To prevail and recover damages under § 1983 under a deliberate indifference theory, a plaintiff must prove that the defendant's actions were both the actual and the *proximate* cause of injury. *Dupree v. Doe*, __ Fed. App'x ___, 2016 WL 1459224, at *2 (3d Cir. Apr. 14, 2016) (per curiam). Dr. Thomas met and evaluated Alexander a single time: on April 30, 2011. At the time, Alexander had been on Level I suicide

watch since he had been received into custody at Monroe County Correctional Facility six days earlier. Upon examination of the decedent, Dr. Thomas found no suicidal or homicidal ideation and no psychotic symptoms—indeed, his treatment notes reflect that Alexander explicitly expressed a desire to live for his family. Dr. Thomas reduced Alexander from Level I suicide watch to Level II suicide watch, which permitted Alexander the comfort of common amenities such as clothing, bedding, and normal food, but did not reduce the frequency of observation checks by corrections officers supervising him while on suicide watch. Dr. Thomas also adjusted Alexander's medications to address sleeping difficulties from which he had been suffering, and he referred him for a follow-up psychiatry appointment with Dr. Dedania the following week. Immediately following Dr. Thomas's evaluation on April 30, 2011, Alexander's condition appears to have improved; at a minimum, the record fails to reflect any deterioration in his condition in the weeks immediately following April 30, 2011. Moreover, Alexander did not commit suicide until *twelve* weeks later, during which time he was closely followed by Dr. Dedania and Pitoniak, and only after the revocation of his parole on July 18, 2011. Dr. Thomas played no role in

Alexander's subsequent treatment by Dr. Dedania or Pitoniak, and there is no evidence that he had any knowledge or awareness of Alexander's revocation hearing or its outcome.

Dr. Thomas never saw Alexander other than on April 30, 2011, and they did not establish an ongoing treating relationship.[14] On one other occasion, while serving as the on-call psychiatrist on May 14, 2011, Dr. Thomas was consulted by telephone by a nurse who described Alexander as nervous and shaking. He prescribed an anti-anxiety drug, Ativan, which was subsequently adjusted by Dr. Dedania when he met with Alexander later that very same day. There is no evidence in the record to suggest that this prescription of Ativan by Dr. Thomas, superseded within hours by a revised medication regimen prescribed by

---

[14] In an effort to suggest the existence of a genuine dispute of fact on this point, the plaintiff directs our attention to deposition testimony by Nurse Oswald, who testified that she spoke with Dr. Thomas, Dr. Dedania, and Pitoniak, collectively, about Alexander on multiple occasions. But her vague—at best—testimony did not reflect any particular dates or time frame for these discussions, nor did it describe the substance or content of these conversations, nor did it identify with whom in particular she conversed. (*See, e.g.*, Doc. 118-8, at 26). Taken as true, Nurse Oswald's testimony fails to contradict Dr. Thomas's affirmative testimony that he did not treat Alexander at any time other than the April 30, 2011, encounter and the May 14, 2011, phone consultation.

Dr. Dedania, played any role in Alexander's death by suicide more than nine weeks later on July 19, 2011.

Viewing the evidence in the light most favorable to the plaintiff, it is clear that the plaintiff has failed to adduce evidence to establish a causal link between Dr. Thomas's treatment decisions on April 30, 2011, or May 14, 2011, and Alexander's death by suicide on July 19, 2011.[15] Moreover, the plaintiff has failed to identify any evidence to demonstrate that Dr. Thomas had actual knowledge of any events of special significance—such as Alexander's July 19, 2011, parole revocation hearing—or of any statements of suicidal ideation—such as Alexander's July 18, 2011, phone conversation with his girlfriend—that might support a claim based on Dr. Thomas's failure to subsequently reinstate Alexander to suicide watch.

Accordingly, we recommend that summary judgment be granted

---

[15] Causation aside, Dr. Thomas provided Alexander with prompt and reasonably attentive medical care. Viewing all the evidence of record, no reasonable jury could find that Dr. Thomas's treatment decisions were recklessly indifferent to Alexander's vulnerability to suicide. *See Dupree*, 2016 WL 1459224, at *2 n.4; *see also Norris v. Frame*, 585 F.2d 1183, 1186 (3d Cir. 1978) ("Where the plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim.").

in favor of Dr. Thomas with respect to Count V.

## 2. Section 1983 Claims against Doctor Dedania

The plaintiff claims that Dr. Dedania was deliberately indifferent to the decedent's particular vulnerability to suicide based on his decision to reduce Alexander from Level II suicide watch to Level III mental health watch on May 7, 2011, and based on his failure to reinstate Alexander to suicide watch at some point prior to his death by suicide on July 19, 2011.

As previously noted, to prevail and recover damages under § 1983 under a deliberate indifference theory, a plaintiff must prove that the defendant's actions were both the actual and the *proximate* cause of injury. *Dupree*, 2016 WL 1459224, at *2. Dr. Dedania met and evaluated Alexander for the first time on May 7, 2011. At the time, Alexander had been on suicide watch for two weeks without incident, during which time he had been seen at least once every other day by a mental health clinician, who had found in each instance that Alexander had expressed no suicidal or homicidal ideation. Alexander complained to Dr. Dedania of anxiety, paranoid feelings, and difficulty sleeping. Dr. Dedania found no suicidal or homicidal ideation and no psychosis. He

adjusted Alexander's medications and reduced him from Level II suicide watch to Level III mental health watch. Immediately following Dr. Dedania's evaluation on May 7, 2011, Alexander's condition appears to have improved; at a minimum, the record fails to reflect any deterioration in his condition in the weeks immediately following May 7, 2011. Moreover, Alexander did not commit suicide until *eleven* weeks later, during which time he continued to receive regular treatment from Dr. Dedania and Pitoniak, and only after the revocation of his parole on July 18, 2011.

Dr. Dedania and Pitoniak met with and evaluated Alexander ten times over the next eleven weeks. Although Alexander continued to complain of anxiety, paranoid thoughts, and sleeplessness—in response to which Dr. Dedania continued to attempt to adjust his medications— Alexander consistently denied any suicidal or homicidal ideation, and he repeatedly contracted for safety with Pitoniak. Alexander was last seen by Dr. Dedania on July 10, 2011—nine days before he committed suicide—presenting with complaints of increased anxiety and paranoid feelings, but denying any suicidal or homicidal ideation; Dr. Dedania adjusted his medications and recommended a follow-up appointment in

two months. Alexander was last seen by Pitoniak on July 11, 2011—eight days before he committed suicide—reporting that he had been "feeling a bit better," and denying any suicidal or homicidal ideation; Pitoniak advised him to follow up with her as needed.

On July 18, 2011, the evidence of record suggests that Alexander's condition took a dramatic turn for the worse when his parole was revoked and he explicitly threatened to commit suicide during a telephone conversation with his girlfriend. But the plaintiff has failed to identify any evidence to demonstrate that Dr. Dedania had actual knowledge of Alexander's upcoming parole revocation hearing, or of the suicidal statements Alexander made to his girlfriend over the telephone. The plaintiff argues that Dr. Dedania *should have known* about the upcoming parole revocation hearing, suggesting that the psychiatrist's failure to affirmatively apprise himself of Alexander's court schedule and anticipate its impact on Alexander's mental and emotional well-being constitutes deliberate indifference. (*See, e.g.*, Doc. 120, at 13). But this argument is contrary to the Supreme Court's holding in *Farmer v. Brennan*, 511 U.S. 825 (1994), which requires actual, subjective knowledge of an excessive risk to inmate health or

safety. The plaintiff has presented the expert report of a forensic psychologist to argue that Dr. Dedania should have taken different or additional steps in treating Alexander, but one doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment. *See White*, 897 F.2d at 110 ("There may, for example, be several acceptable ways to treat an illness."). Ultimately, there is no evidence in the record before this Court to demonstrate that Dr. Dedania had actual knowledge of Alexander's upcoming parole revocation hearing, nor of its adverse outcome, nor of Alexander's subsequent statements of suicidal ideation made in a telephone conversation with his girlfriend on the eve of his suicide attempt.

Based on the foregoing, it is evident that Dr. Dedania provided Alexander with prompt and reasonably attentive medical care. Viewing all the evidence of record, no reasonable jury could find that Dr. Dedania's treatment decisions were recklessly indifferent to Alexander's vulnerability to suicide. *See Dupree*, 2016 WL 1459224, at *2 n.4; *Beers-Capitol*, 256 F.3d at 133; *Norris*, 585 F.2d at 1186.

Viewing the evidence in the light most favorable to the plaintiff, the plaintiff has failed to adduce sufficient evidence to establish a

causal link between Dr. Dedania's treatment decisions on May 7, 2011, and Alexander's death by suicide on July 19, 2011 Moreover, the plaintiff has failed to identify any evidence to demonstrate that Dr. Dedania had actual knowledge of Alexander's upcoming July 18, 2011, parole revocation hearing, of its adverse outcome, or of Alexander's subsequent statements of suicidal ideation to his girlfriend over the telephone, to support a claim based on Dr. Dedania's failure to reinstate Alexander to suicide watch. Finally, viewing all the evidence of record, no reasonable jury could find that Dr. Dedania's treatment decisions were recklessly indifferent to Alexander's vulnerability to suicide.

Accordingly, we recommend that summary judgment be granted in favor of Dr. Dedania with respect to Count V.

### 3. *Section 1983 Claims against Officer Landon*

The plaintiff claims that Landon was deliberately indifferent to an inmate's serious medical need because he administered CPR to Alexander while chewing gum and, as a result, the chewing gum fell into Alexander's mouth and partially blocked his airway. The plaintiff contends that administering mouth-to-mouth rescue breathing while chewing gum at the same time is inherently and obviously dangerous

conduct, and thus doing so evidences deliberate indifference. The key factual premise of the plaintiff's theory of liability against Landon is, of course, that Landon disregarded this obvious danger and administered rescue breathing while chewing gum at the same time.[16]

Landon has conceded that he was chewing gum immediately prior to beginning CPR on Alexander. But he has disputed the factual premise of the plaintiff's claim, contending instead that he recognized the very danger posited and spit his gum out before beginning rescue breathing. The gum, however, struck his arm and accidentally fell into Alexander's open mouth. Landon claims that he attempted unsuccessfully to remove the gum before beginning rescue breathing, and that the gum did not block Alexander's airway entirely as his chest rose observably when rescue breathing was administered.

In support of his motion for summary judgment, Landon has cited his own deposition testimony. At his deposition, Landon testified:

> A.   While performing CPR, tilting the head back, opening the lower jaw, my giving CPR, I went to spit

---

[16] We do not reach the ultimate question—whether administering CPR while chewing gum *at the same time* constitutes deliberate indifference—as the plaintiff has failed to adduce competent evidence to support this factual premise.

out the gum to my right-hand side, it hit my right arm and fell directly in Inmate Alexander's mouth.

Q.    Please describe what you then did.

A.    First thing I did was taking my right arm I tried to retrieve the gum. I could not. I also felt like it was not blocking the airways. At this point they had done the chest compressions. It was time for breath.

Q.    Why did you feel it was not blocking the airways?

A.    To me it seemed like it was off to the right side of his mouth.

Q.    Then what happened?

A.    Then I performed mouth to mouth without a mouth guard. I didn't have one present at the time.

Q.    And was there any reaction by Alexander to your efforts?

A.    His chest did rise, which indicated that he was receiving air.

(Doc. 113-3, at 4). "An accident or inadvertence or mere negligence does not in itself trigger the Eighth Amendment." *Rodriguez v. Nichols*, 521 Fed. App'x 47, 48 (3d Cir. 2013) (per curiam) (brackets omitted). Thus, based on this evidence, Landon has made the requisite *prima facie* showing that he is entitled to summary judgment. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

In light of the evidence discussed above, the burden has shifted to

the plaintiff to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. In her brief in opposition to summary judgment on this claim, the plaintiff argues, without citation to particular parts of the materials in the record, that "a nurse said Landon was attempting CPR when he blew gum into Alexander's mouth" (Doc. 125, at 24), from which the plaintiff has inferred that Landon attempted to actively administer mouth-to-mouth rescue breathing with chewing gum in his mouth *at the same time* (*see id.* at 18, 23). In her counter-statement of facts, the plaintiff asserted that: "Landon attempted to do CPR with gum in his mouth." (Doc. 124, at 12). In support, she cited to the deposition of Laura Zieger, PHRN, a nurse with the emergency medical service team that arrived later to treat Alexander and transport him out of the prison to a local hospital. (*Id.*). At her deposition, Zieger testified:

> A.    . . . I know he was found by the guards and they initiated the CPR, and, *again this is from what a nurse had told me that was there*, and the guard accidentally blew gum into the patient's mouth while he was performing CPR.

> Q.    You use the term accidentally. Who gave you that?

> A.    The nurse.

Q.    And she said while he was doing CPR?

A.    Yes.

(Doc. 124-10, at 62–63 (emphasis added)).

"Like affidavits, deposition testimony that is not based on personal knowledge and is hearsay is inadmissible and cannot raise a genuine issue of material fact sufficient to withstand summary judgment." *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir. 1990); *see also Masonheimer v. Colonial Penn Ins. Co.*, 959 F. Supp. 698, 702 (E.D. Pa. 1997) (quoting *Skillsky*); *Grier v. Galinac*, 745 F. Supp. 1058, 1060–61 (M.D. Pa. 1990). *See generally* Fed. R. Civ. P. 56(c); *Pamintuan*, 192 F.3d at 387 n.13; *Bender*, 994 F. Supp. 2d at 599.[17] Zieger was not present when Landon and the others began to administer CPR, and she did not observe the manner by which Landon's gum found its way into Alexander's airway. (*See* Doc. 124-10, at 61–63). Her testimony that "the guard accidentally blew gum into the patient's mouth" is a classic example of an inadmissible hearsay statement, and it does not suffice to establish a genuine dispute of material fact *contra*

---

[17] We note that the defendants have not raised this objection, *see generally* Fed. R. Civ. 56(c)(2), but we have discretion to raise the issue *sua sponte*. *Grier*, 745 F. Supp. at 1061 n.3.

Landon's first-hand account of the incident.

At its discretion, a court may consider other materials in the record. *See* Fed. R. Civ. P. 56(c)(3). It appears that, in addition to Landon himself, non-party Correction Officers Libretti, Howard, Colon, and Johnson, and non-party Nurses Williams and Joyce were also present in the initial moments after Alexander was discovered hanging from a bunk and Landon and others began their lifesaving efforts. Nurse Williams testified:

> Q.     How did you learn that Alexander had gum in his mouth?
>
> A.     When I arrived and, as I said, the officers were doing CPR, Officer Langdon [*sic*] was at the head doing rescue breaths. He had advised me that there was gum. And I said—I asked how there was gum. And he said he had turned to spit it out and it bounced off some concrete, I don't know what—he didn't really point because he was moving—I can't—he was moving his head to—just to the side and then it had gone into his mouth. And then he had started rescue breathing.

(Doc. 113-4, at 13–14). Officers Howard and Libretti both testified that they were neither aware that Landon had been chewing gum, nor that it had fallen into Alexander's mouth, until after the incident. (Doc. 124-11, at 10, 12, 14–15, 30, 34). Officer Colon testified that she heard someone say "that gum fell in Alexander's mouth," but she did not

arrive until after CPR had already been initiated. (Doc. 124-10, at 47–48). Colon testified that, before she began her turn at rescue breathing, she attempted a finger sweep to clear any gum that might be blocking Alexander's airway, but she found none. (*Id.* at 48). The evidence in the record does not include any testimony or written report by Officer Johnson or Nurse Joyce. None of this evidence supports the plaintiff's theory; indeed, it appears only to corroborate Landon's account with a consistent contemporaneous explanation provided to Nurse Williams.

Based on the foregoing, we find that the plaintiff has failed to satisfy her burden of citing particular potentially admissible evidence in the record to demonstrate the existence of a genuine dispute of material fact.

Accordingly, we recommend that summary judgment be granted in favor of Officer Landon with respect to Count II.

### 4. Section 1983 Claims against Monroe County

The plaintiff claims that Monroe County, the county that operates the Monroe County Correctional Facility, is vicariously liable under § 1983 for the underlying violations of Alexander's constitutional rights, based on the deliberate indifference of its employees and independent

contractors.

"On its face, § 1983 makes liable 'every person' who deprives another of civil rights under color of state law." *Burns v. Reid*, 500 U.S. 478, 497 (1991) (Scalia, J., concurring in part and dissenting in part). In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court of the United States established that municipalities and other local governmental units are included among those "persons" subject to liability under § 1983. *Id.* at 690. Monroe County is such a municipality subject to liability as a "person" under § 1983. *See id.* at 694; *Mulholland v. Gov't County of Berks*, 706 F.3d 227, 237 (3d Cir. 2013).

A municipality can be liable under § 1983 only if the conduct alleged to be unconstitutional either "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690–91. "A plaintiff must identify the challenged policy, attribute it to the [municipality] itself, and show a causal link

between execution of the policy and the injury suffered." *Losch v. Borough of Parkesburg*, 736 F.2d 903, 910 (3d Cir. 1984). "Even in the absence of formal policymaking activity, an 'official policy' may be inferred from informal acts or omissions of supervisory municipal officials . . . ." *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 671 (3d Cir. 1988) (citations and internal quotation marks omitted). For example, in *Colburn*, the Third Circuit found that "a custom of laxity regarding the supervision and monitoring of their jail cells and in searching individuals taken into police custody," which led to a detainee's suicide using a hidden firearm, constituted an "official policy" under *Monell* and § 1983. *Id.* at 671. In particular, the *Colburn* court noted that the plaintiff was the third inmate to commit suicide in the jail within a three-year span, providing the municipality and its governing officials with actual or constructive knowledge of the alleged custom of inadequate monitoring of jail cells. *See id.* at 672; *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985) ("[A] single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be

attributed to a municipal policymaker."); *Brown v. City of Pittsburgh*, 586 F.3d 263, 292–93 (3d Cir. 2009) (recognizing that where no explicit policy is identified, "'more proof than the single incident will be necessary' to establish a causal connection between the incident and some municipal policy").

Here, the County has adopted a jail suicide-prevention policy, but the plaintiff contends that the policy is inadequate and the cause of Alexander's death by suicide. In particular, the plaintiff claims that the jail suicide prevention policy adopted by the County failed to provide a procedure or mechanism for sharing an at-risk inmate's legal records with medical/psychiatric staff to apprise them of upcoming "high risk" events, such as a sentencing or parole revocation hearings, as a matter of course. (*See* Doc. 125, at 12). The plaintiff further claims that the County should be held liable under *Monell* for its failure to prohibit correctional staff from chewing gum at the jail, where they might be called upon to perform CPR. (*See id.*). The plaintiff also suggests, without articulating any particular deficiencies or proposed alternatives, that the jail's suicide-prevention policy was generally inadequate as it failed to protect Alexander from self-harm. (*See id.* at

13–14).

First, with respect to the plaintiff's argument that the jail's suicide-prevention policy was generally inadequate in light of its failure to protect Alexander, we note that vague assertions of policy deficiencies are insufficient to impose liability under *Monell* and § 1983. *See Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995).

Second, we note that "a prison custodian is not the guarantor of a prisoner's safety. We cannot infer from the prisoner's act of suicide itself that the prison officials have recklessly disregarded their obligation to take reasonable precautions to protect the safety of prisoners entrusted to their care." *Freedman v. City of Allentown, Pa.*, 853 F.2d 1111, 1115 (3d Cir. 1988) (citing *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). "The key factor in determining whether a system for psychological or psychiatric care in a jail or prison is constitutionally adequate is whether inmates with serious mental or emotional illnesses or disturbances are provided reasonable access to medical personnel qualified to diagnose and treat such illnesses or disturbances." *Pierce*, 612 F.2d at 763 (footnote omitted). Here, the policy at issue provided for all inmates to be screened for suicide risk upon intake, for at-risk

inmates to be provided reasonable access to mental health treatment, and for at-risk inmates to be placed on "suicide watch" or "mental health watch" with special restrictions and heightened supervision to reasonably secure the inmates' health and safety.[18]

The essence of the plaintiff's claim is that the Monroe County Correctional Facility's suicide-prevention policy falls short of the ideal, primarily because it did not provide for the sharing of legal records or court scheduling information that might have alerted the mental health professionals treating Alexander to anticipate an increased vulnerability to suicide in the hours and days after his parole revocation hearing. But policies are not deficient simply because they are not the best. *See Serafin v. City of Johnstown*, 53 Fed. App'x 211, 215 (3d Cir. 2002) ("The fact that the City's policy was not the most effective policy possible, however, does not, without more, create an unreasonable risk to detainees' safety or demonstrate the City's indifference to such a risk, and there is no 'more' here."). Indeed—as the Supreme Court of the United States itself has recently observed—although Third Circuit

---

[18] Moreover, the policy provided that suicide watch or mental health watch could only be reduced or removed by a psychiatrist or his designee.

precedent provides that prison officials who know of a particular vulnerability to suicide are obligated not to act with reckless indifference to that vulnerability, that circuit precedent *does not* require "formal physical or mental health screening," nor does it "identify any minimum [suicide] screening procedures or prevention protocols that facilities must use." *Taylor v. Barkes*, 135 S. Ct. 2042, 2045 (2015) (per curiam) (discussing *Colburn v. Upper Darby Twp.*, 838 F.2d 663 (1988), and *Colburn v. Upper Darby Twp.*, 946 F.2d 1017 (1991)).

Third, we note that, although the evidence of record demonstrates that Alexander was the sixth inmate at Monroe County Correctional Facility to have attempted suicide within the five-year period preceding his death, the previous five attempts appear to have been unsuccessful. (Doc. 102-9, at 12, 18; Doc. 118-9, at 12, 18; Doc. 120-9, at 12, 18). Moreover, there is nothing to suggest that any of these prior attempted inmate suicides involved a purported communication failure like that at issue here—the failure of prison officials to share legal records or court scheduling information with mental health providers to apprise them of potential "high risk" events that could trigger suicidal ideation or conduct. Nor, for that matter, is there any evidence to suggest that any

use of chewing gum by corrections staff has adversely affected staff efforts to administer CPR to inmates in the past. Under these circumstances, the evidence is simply insufficient to permit a reasonable jury to find that the County and its governing officials had actual or constructive knowledge of the purported policy deficiencies upon which the plaintiff's § 1983 *Monell* claim is premised. *See Tuttle*, 471 U.S. at 823–24; *Brown*, 586 F.3d at 292–93; *Colburn*, 838 F.2d at 672.

Finally, we have found that the plaintiff has failed to establish an underlying deprivation of a constitutionally protected right with respect to Landon and the medical defendants. Because we find that there was no underlying violation of Alexander's constitutional rights, it necessarily follows that there is no municipal liability. *See Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003) ("[F]or there to be municipal liability, there . . . must be a violation of the plaintiff's constitutional rights.").

Accordingly, we recommend that summary judgment be granted to Monroe County with respect to Count I.

### 5. Section 1983 Claims against Warden Asure

The plaintiff similarly claims that Donna Asure, warden of Monroe County Correctional Facility, is vicariously liable under § 1983 for the underlying violations of Alexander's constitutional rights, based on the deliberate indifference of her subordinates.

"Civil rights claims cannot be premised on a theory of *respondeat superior*. Rather, each named defendant must be shown . . . to have been personally involved in the events or occurrences which underlie a claim." *Millbrook v. United States*, 8 F. Supp. 3d 601, 613 (M.D. Pa. 2014) (citation omitted). "A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved." *Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007). Personal involvement may be established through: (1) personal direction or actual participation by the defendant in the misconduct; or (2) knowledge of an acquiescence in the misconduct. *Id.*

The plaintiff has failed to identify any evidence in the record to suggest that Warden Asure personally participated in any of the purported misconduct: Warden Asure was not involved in Alexander's

medical or psychiatric treatment, nor was she involved in lifesaving efforts when Alexander attempted to hang himself in his cell on July 19, 2011. Nor has the plaintiff identified any evidence in the record to suggest that Warden Asure personally directed Dr. Dedania, Dr. Thomas, Officer Landon, or any other individual in the violation of Alexander's constitutional rights. Nor has the plaintiff identified any evidence in the record to suggest that Warden Asure knew of and acquiesced in any misconduct. Warden Asure was not involved in Alexander's medical or psychiatric treatment, nor was she involved in lifesaving efforts when Alexander attempted to hang himself in his cell on July 19, 2011. Moreover, a prison administrator cannot be found deliberately indifferent under the Eighth Amendment because he or she fails to respond to the medical needs of an inmate being treated by a prison physician, or because, as non-physicians, they defer to the medical judgment of the inmate's treating physicians. *Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

Alternatively, § 1983 liability may result if a supervising defendant caused a subordinate to violate another's constitutional rights through the execution of an official policy or settled informal

custom. *See Sample v. Diecks*, 885 F.2d 1099, 1117–18 (3d Cir. 1989).

> [T]o hold a supervisor liable because his policies or practices led to an Eighth Amendment violation, the plaintiff must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice.

*Beers-Capitol*, 256 F.3d at 134 (citing *Sample*, 885 F.2d at 1118).

With respect to supervisory liability for Warden Asure, the policy identified by the plaintiff is the same as that identified with respect to the County. For the same reasons discussed in the preceding section of this report, we find that the plaintiff has failed to adduce evidence that the existing suicide-prevention policy at Monroe County Correctional Facility created an unreasonable risk of the Eighth Amendment injury at issue—deliberate indifference to an inmate's particular vulnerability to suicide. Moreover, we note that there is nothing in the record to suggest that Warden Asure was aware that any unreasonable risk was created by the policy or that she was indifferent to that risk, such as it

was.[19]

Accordingly, we recommend that summary judgment be granted to Warden Asure with respect to Count I.

### 6. Section 1983 Claims against PrimeCare

PrimeCare is a private corporation that has contracted with Monroe County to provide medical and mental health care to inmates at the jail. PrimeCare contracted with defendant-psychiatrists Dedania and Thomas to provide psychiatric services to inmates at the jail. PrimeCare is also the employer of non-party Jennifer Pitoniak, LSW, a mental health clinician who evaluated Alexander several times in the months leading up to his suicide.

"[A]lthough a private corporation offering medical services cannot be held liable for an alleged § 1983 violation under a theory of *respondeat superior*, it can be held liable for a policy or custom that demonstrates deliberate indifference." *Francis v. Carroll*, 659 F. Supp. 2d 619, 625–26 (D. Del. 2009) (internal quotation marks omitted). *See*

---

[19] We note also that, to the extent the plaintiff contends that Warden Asure was deliberately indifferent due to her failure to adopt or implement more effective suicide prevention procedures, she is very likely entitled to qualified immunity. *See Taylor v. Barkes*, 135 S. Ct. 2042, 2044–45 (2015).

*generally Monell v. Dep't of Social Servs. of N.Y.*, 436 U.S. 658 (1978) (subjecting municipalities to liability for policies or customs that cause constitutional deprivations); *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (applying *Monell* to a private company providing medical services to inmates). Thus, to prevail on its claim against PrimeCare, the plaintiff must establish that there was a relevant PrimeCare policy or custom, and that this policy or custom caused the constitutional violation for which she seeks relief. *See Natale*, 318 F.3d at 583–84.

Here, PrimeCare has adopted a suicide-prevention policy applicable to the Monroe County Correctional Facility. The plaintiff contends that this policy is deficient because it failed to provide a procedure by which medical/psychiatric staff would obtain an inmate's legal records or court scheduling information to apprise themselves of upcoming "high risk" events, such as a sentencing or parole revocation hearing, as a matter of course. (*See* Doc. 103, at 15–16).

Although the expert opinion evidence adduced by the plaintiff suggests that the PrimeCare suicide-prevention policy could be improved upon, for the same reasons expressed above with respect to

the identical argument concerning the County suicide-prevention policy, we find that the plaintiff has failed to demonstrate that this less-than-ideal corporate suicide-prevention policy created an unreasonable risk to inmate safety, nor that PrimeCare was recklessly indifferent to such a risk in failing to modify its policy as the plaintiff's experts have suggested. *See Taylor*, 135 S. Ct. at 2045; *Serafin*, 53 Fed. App'x at 215.

More importantly, having failed to adduce evidence to support a constitutional claim against any of the individual medical defendants, the plaintiff has failed to establish a claim against PrimeCare under *Monell* as well. *See Deninno v. Municipality of Penn Hills*, 269 Fed. App'x 153, 158 (3d Cir. 2008).

Accordingly, we recommend that summary judgment be granted to PrimeCare with respect to Count IV.

### C. State Law Negligence Claims

In Count VI of the second amended complaint, the plaintiff has asserted state-law medical negligence claims against Dr. Dedania, Dr. Thomas, and PrimeCare.

### 1. MHPA Immunity

Dr. Dedania has moved for summary judgment with respect to the

plaintiff's state law negligence claim on the ground that he is entitled to immunity from suit under the Pennsylvania Mental Health Procedures Act ("MHPA"), 50 P.S. § 7101, *et seq.* The MHPA "establishes rights and procedures for all involuntary treatment of mentally ill persons, whether inpatient or outpatient, and for all voluntary inpatient treatment of mentally ill persons." *Id.* § 7103. The MHPA includes a provision conferring immunity from civil liability on a physician who participates in certain decisions under the procedures set forth in that act:

> In the absence of willful misconduct or gross negligence, a county administrator, a director of a facility, a physician, a peace officer or any other authorized person who participates in a decision that a person be examined or treated under this act, or that a person be discharged, or placed under partial hospitalization, outpatient care or leave of absence, or that the restraint upon such person be otherwise reduced, or a county administrator or other person who denies an application for voluntary treatment or for involuntary emergency examination and treatment, shall not be civilly or criminally liable for such decision or any of its consequences.

50 P.S. § 7114(a)

But while it is clear from the evidence of record that Dr. Dedania provided Alexander with mental health treatment, there is no evidence

in the record to suggest that proceedings for the involuntary examination or treatment of Alexander pursuant to the MHPA were instituted while he was incarcerated at Monroe County Correctional Facility, nor is there any evidence in the record that his treatment while incarcerated there constitutes "voluntary inpatient treatment" as defined in the act. In the absence of such evidence, the MHPA does not provide Dr. Dedania with immunity from the plaintiff's state law negligence claims. *See Herman*, 482 F. Supp. 2d at 567–68.

### 2. Applicable Standard of Care

"Under Pennsylvania law, to state a *prima facie* case of medical malpractice, a plaintiff must provide a medical expert who will testify as to the applicable standard of care (*i.e.* the duty) that the physician owed the patient, that the physician breached that standard or duty, and that the breach was the proximate cause of the harm suffered." *Miville v. Abington Mem. Hosp.*, 377 F. Supp. 2d 488, 490–91 (E.D. Pa. 2005). With respect to the applicable standard of care that Dr. Thomas and Dr. Dedania owed to Alexander, the plaintiff has proffered the expert report of Frank Dattilio, Ph.D.—a licensed forensic *psychologist*.

The medical defendants have moved for summary judgment with

respect to the plaintiff's state-law medical negligence claims on the ground that she has failed to adduce sufficient evidence to establish a *prima facie* case of medical negligence. In particular, they argue that she has failed to produce any evidence with respect to one of the required elements of proof in a medical malpractice action because, under Pennsylvania state law, a non-physician is not qualified to testify against a physician with respect to the applicable standard of care.

In 2002, the Pennsylvania state legislature enacted the Medical Care Availability and Reduction of Error Act ("MCARE"), 2002 Pa. Laws. 13 (codified in relevant part at 40 P.S. § 1303.512). Section 512 of MCARE provides that, in a medical professional liability action against a physician, an expert testifying on the applicable standard of care must "[p]ossess an unrestricted physician's license to practice medicine in any state or the District of Columbia." 40 P.S. § 1303.512(b)(1). The Supreme Court of Pennsylvania subsequently held that the statute's reference "to an expert 'possessing an unrestricted physician's license to practice medicine' unambiguously denotes a medical doctor or osteopath licensed by a state board appropriate to such practices." *Wexler v. Hecht*, 928 A.2d 973, 981 (Pa. 2007). Moreover, as the state supreme

court observed, "there is no provision for waiver of this requirement relative to expert testimony concerning the applicable standard of care." *Id.* at 981–82; *see also* 40 P.S. § 1303.512(b). Thus, a non-physician, such as a doctor of psychology, is simply not competent under MCARE to provide evidence on the applicable standard of care in a medical professional liability action against a physician. *Wexler*, 928 A.2d at 981–82.[20]

Under the federal rules, "in a civil case, state law governs the witness's competency regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 601.

> In plain terms, section 512 of MCARE is a rule of witness competency rather than a rule of expert qualification. Thus, section 512 of MCARE is applied to the instant case under [Fed. R. Evid.] 601 and [the plaintiff's] expert witnesses must meet the requirements of section 512 in order to be competent to testify against [Dr. Thomas and Dr. Dedania].

---

[20] We note that the medical defendants have also referenced other expert competency provisions under Section 512 requiring that an expert testifying as to a physician's standard of care practice in the same subspecialty as the defendant-physician and, if the defendant-physician is board-certified, the expert must be similarly board-certified. Unlike the "licensed physician" requirement, which is absolute, these competency provisions may be waived at the court's discretion. *See* 40 P.S. § 1303.512(c), (d), (e); *see also Miville*, 377 F. Supp. 2d at 493–95.

*Miville*, 377 F. Supp. 2d at 493.

The only standard-of-care evidence submitted into the record by the plaintiff to support her state-law medical negligence claims against these physicians is the testimony of a psychologist, who is not qualified to present such testimony under MCARE.

Accordingly, we recommend that summary judgment be granted to Dr. Thomas, Dr. Dedania, and PrimeCare with respect to Count VI.

## V.    RECOMMENDATION

For the foregoing reasons, it is recommended that:

1.    The defendants' motions for summary judgment (Doc. 99; Doc. 106; Doc. 109; Doc. 112) be **GRANTED**;

2.    The Clerk be directed to enter **JUDGMENT** in favor of the defendants and against the plaintiff; and

3.    The Clerk be directed to **CLOSE** this case.

Dated: September 7, 2016          ***s/ Joseph F. Saporito, Jr.***
                                  JOSEPH F. SAPORITO, JR.
                                  United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

DEBRA L. ALEXANDER, adoptive
parent and Administratrix of the
Estate of Scott Alonzo Alexander,

CIVIL ACTION NO. 3:13-cv-01758

      Plaintiff,

(KOSIK, J.)
(SAPORITO, M.J.)

      v.

MONROE COUNTY, et al.,

      Defendants.

## NOTICE

NOTICE IS HEREBY GIVEN that the undersigned has entered the foregoing Report and Recommendation dated September 7, 2016. Any party may obtain a review of the Report and Recommendation pursuant to Local Rule 72.3, which provides:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636(b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo

determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Dated: September 7, 2016

_**s/ Joseph F. Saporito, Jr.**_
JOSEPH F. SAPORITO, JR.
United States Magistrate Judge