**IN THE UNITED STATES DISTRICT COURT FOR**
**THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DEBRA L. ALEXANDER, adoptive parent and Administratrix of the Estate of Scott Alonzo Alexander, | : : : | CASE NO.: 3:13-cv-01758-EMK |
| Plaintiff | : : | JUDGE EDWIN M. KOSIK MAG. JUDGE JOSEPH F. SAPORITO, JR. |
| v. | : : | *Electronically Filed* |
| MONROE COUNTY; et al. Defendants | : : : | JURY TRIAL DEMANDED |

<u>PRIMECARE MEDICAL DEFENDANTS' BRIEF IN
OPPOSITION TO PLAINTIFF'S OBJECTIONS TO THE REPORT
AND RECOMMENDATION FILED SEPTEMBER 7, 2016 (DOC. 127)</u>

### I. <u>PROCEDURAL HISTORY</u>

This matter arises from the suicide of Scott Alonzo Alexander during his incarceration at the Monroe County Correctional Facility (hereinafter "MCCF"). Plaintiff commenced this action with the filing of a Complaint (Doc. 1) on June 25, 2013. Plaintiff filed an Amended Complaint (Doc. 17) on September 13, 2013, and a Second Amended Complaint (Doc. 37) on November 5, 2013. After rulings on Motions to Dismiss, Plaintiff's claim for an alleged violation of Mr. Alexander's Eighth Amendment rights and negligence claims proceeded through discovery. The PrimeCare Medical Defendants (Deborah Wilson, D.O., Wendy Johnson, LPN and PrimeCare Medical, Inc.) filed a Motion for Summary Judgment (Doc. 99), supporting Brief (Doc. 100), and a Statement of Undisputed Facts (Doc. 101). Plaintiff did not oppose summary judgment in favor of Dr. Wilson and Wendy Johnson. Magistrate Judge Saporito issued a Report and Recommendation (Doc.

126) that summary judgment be entered in favor of all the Defendants.   Plaintiff filed

Objections (Doc. 127) to the Report and Recommendation and a supporting Brief (Doc.

128) on September 21, 2016.  This Brief is filed in response to Plaintiff's Objections.

## II. <u>STATEMENT OF FACTS</u>

Scott Alexander began his relevant incarceration at MCCF on April 24, 2011.

(Plaintiff's Complaint (Doc. 1, ¶ 21.)  Mr. Alexander had been charged with theft by unlawful

taking, receiving stolen property, and recklessly endangering another person.  (Doc. 1, ¶

19.)  Mr. Alexander was on parole at the time of his arrest for prior criminal charges.  (Doc.

1, ¶ 20.)

Upon intake to MCCF, Mr. Alexander underwent an initial medical screening and an

Intake Suicide Screening.  (Doc. 101, Exhibits A and B.)  The Intake Suicide Screening

contains a number of questions and assigns a point total to the responses provided to the

questions.  If an inmate scores an eight (8) or more on the screen, he is placed on a suicide

watch.  (Doc. 101, Exhibit B.)  Mr. Alexander scored a 21 and was placed upon a Level I

suicide watch.  (Doc. 101, Exhibit B.)

PrimeCare has a suicide prevention policy.  (Doc. 101, Exhibit C.)  The suicide

prevention policy conforms to National Commission on Correctional Healthcare standards.

(Doc. 101, Exhibit D.)

Mr. Alexander was evaluated by Jennifer Pitoniak, LSW on April 26, 2011, at

approximately 11:30 a.m.  (Doc. 101, Exhibit E, p. 1.)  Ms. Pitoniak has a Bachelor's and

Master's degree from Marywood University, and she is a licensed social worker in the

Commonwealth of Pennsylvania.  (Doc. 101, Exhibit F, p. 7, lines 5-22.)

There are three levels of suicide precautions:  Level I, Level II, and Level III.  (Doc.

101, Exhibit F, p. 27, line 13 through p. 28, line 7.)  A Level I suicide watch is where the

inmate only has access to a suicide smock, suicide blanket, and would have finger foods. The inmate is also closely watched by security staff every fifteen minutes.  A Level II suicide watch is where the inmate is still observed every fifteen minutes, but the inmate would have access to clothing, toiletries and a blanket.  (Doc. 101, Exhibit F, p. 34, lines 1-19.)  Only a psychiatrist could move inmates from Level I to Level II and then Level III.   (Doc. 101, Exhibit F, p. 27, lines 21-22.)  A Level III was considered a mental health watch, and Ms. Pitoniak was able to remove an inmate from that status.  (Doc. 101, Exhibit F, p. 28, lines 2-5.)

Ms. Pitoniak evaluated Mr. Alexander on April 26, 27, and 28, 2011, while he was on Level I precautions.  Mr. Alexander denied suicidal ideation during all three evaluations. (Doc. 101, Exhibit E, pp. 2-3.)

Mr. Alexander was evaluated by Dr. Alex Thomas on April 30, 2011. (Doc. 101, Exhibit E, p. 3.)  Dr. Alex T. Thomas is a psychiatrist who graduated from Trivandrum Medical School at Kerala University in India in 1982.  He has been licensed to practice medicine in the Commonwealth of Pennsylvania since 1988.  (Doc. 101, Exhibit G, p. 6, lines 4-21.)  Dr. Thomas has a contract with PrimeCare which includes Dr. Thomas providing psychiatric services to inmates incarcerated at MCCF.  (Doc. 101, Exhibit G, p. 9, lines 4-15.)

Dr. Thomas evaluated Mr. Alexander on April 30, 2011, because Ms. Pitoniak placed Mr. Alexander on the list to be evaluated due to the suicide watch status.  (Doc. 101, Exhibit G, p. 12, lines 2-9.)  Mr. Alexander did not have any suicidal ideation during this evaluation with Dr. Thomas.  Dr. Thomas' plan was to decrease the suicide watch from Level I to Level II, to prescribe Remeron 15 mg. at bed time, and for Mr. Alexander to follow up with Dr.

Dedania.  (Doc. 101, Exhibit G, p. 14, lines 1-13.)   Dr. Thomas had no further personal contact with Mr. Alexander. (Doc. 101, Exhibit E.)

Ms. Pitoniak evaluated Mr. Alexander on May 2, May 3, and May 5, 2011.  (Doc. 101, Exhibit E, p. 6.)  Mr. Alexander reported to Ms. Pitoniak that he was feeling better, and there was no indication that Mr. Alexander was suicidal during these evaluations.  (Doc. 101, Exhibit E, p. 6.)

Dr. Kishorkumar Dedania is a board certified psychiatrist who graduated from medical school in India in the 1980s.  (Doc. 101, Exhibit H, p. 5, line 23 through p. 6, line 19.)  Dr. Dedania has a contract with PrimeCare to provide psychiatric services to inmates in MCCF.  (Doc. 101, Exhibit H, p. 6, line 17 through p. 7, line 1.)

Dr. Dedania evaluated Mr. Alexander on the following days during the relevant incarceration:  May 7, 2011; May 14, 2011, June 4, 2011, July 2, 2011, and July 10, 2011. (Doc. 101, Exhibit H, p. 8, line 21 through p. 9, line 2.)   On May 7, 2011, Dr. Dedania evaluated Mr. Alexander and noted that Mr. Alexander was complaining of not sleeping and feeling anxious and paranoid, as well as that his medications were not working.  In utilizing his education, training and experience, Dr. Dedania did not assess Mr. Alexander as being either suicidal, homicidal, or psychotic.  (Doc. 101, Exhibit H, p. 9, lines 13-24.)   Thus, Dr. Dedania used his judgment to reduce suicide precautions to a Level III.  (Doc. 101, Exhibit H, p. 9, lines 23-24.)   Dr. Dedania also modified Mr. Alexander's medications by discontinuing Remeron, but starting Sinequan 100 mg. at bedtime for 90 days.  (Doc. 101, Exhibit H, p. 10, lines 1-7.)

Ms. Pitoniak evaluated Mr. Alexander on May 9, 2011, because Mr. Alexander was upset about his friend dying.  No suicidal ideation was noted.  She again evaluated Mr. Alexander on May 10, 2011.  Mr. Alexander indicated he was doing much better, had no

suicidal ideation, was calm, and had contracted for safety.   Consequently, Ms. Pitoniak utilized her professional judgment and discontinued the Level III watch.  (Doc. 101, Exhibit E, p. 7.)

Dr. Dedania next evaluated Mr. Alexander a week later on May 14, 2011.  (Doc. 101, Exhibit H, p. 10, lines 16-18.)  Mr. Alexander complained of feeling anxious and restless after he allegedly found out his daughter was to be put up for adoption.  (Doc. 101, Exhibit H, p.10, line 22 through p. 11, line 4.)  As an aside, Mr. Alexander did not have any children. Dr. Dedania found that Mr. Alexander was not suicidal, homicidal or psychotic.   However, he did prescribe Ativan 1 mg three times per day.  (Doc. 101, Exhibit H, p. 11, lines 2-3.)

Mr. Alexander submitted a sick call request on May 24, 2011, seeking to speak with Ms. Pitoniak "about something personal going on.  Has nothing to do with MEDS."  The response to the sick call indicates that Ms. Pitoniak saw Mr. Alexander on May 25, 2011. (Doc. 101, Exhibit I.)

Mr. Alexander submitted another sick call request on May 25, 2011, which was received in the medical department on May 26, 2011.  (Doc. 101, Exhibit I.)  Ms. Pitoniak evaluated Mr. Alexander on May 26, 2011.  (Doc. 101, Exhibit E, p. 9.)  Mr. Alexander claimed to be feeling a bit paranoid.   He had no suicidal or homicidal ideation.   Ms. Pitoniak's assessment was that Mr. Alexander appeared fine and follow up was to occur as needed.  (Doc. 101, Exhibit E, p. 9.)

Ms. Pitoniak evaluated Mr. Alexander on June 3, 2011, because Mr. Alexander was upset that his girlfriend's daughter passed away.  (Doc. 101, Exhibit E, p. 9.)  Mr. Alexander was not suicidal, but Ms. Pitoniak referred Mr. Alexander to the psychiatrist for a medication review.  (Doc. 101, Exhibit E, p. 9.)

Dr. Dedania followed up with Mr. Alexander the next day, on June 4, 2011.  Mr. Alexander complained of feeling nervous, anxious, paranoid and depressed, but was not suicidal or homicidal.  He was prescribed the following medications:  Thorazine – 50 mg. in the morning and 100 mg. at bed time; Ativan – 1 mg. three times per day; and Paxil – 20 mg. in the morning.  (Doc. 101, Exhibit H, p. 14, lines 9-22.)

On June 27, 2011, Mr. Alexander submitted a sick call request concerning his medications and feeling unsafe, paranoid, agitated, and uneasy during the hours 2:00 p.m. to 8:00 p.m. (Doc. 101, Exhibit I.)  Mr. Alexander was seen in the medical department on June 28, 2011, and he was noted as being anxious and paranoid.  He had no suicidal or homicidal ideation, and he contracted for safety.  (Doc. 101, Exhibit E, p. 11.)

Ms. Pitoniak evaluated Mr. Alexander on June 29, 2011.  (Doc. 101, Exhibit E, p. 11.)  Mr. Alexander reported having a difficult time dealing with anxiety and depression mostly in the afternoon (Doc. 101, Exhibit E, p. 11.)  He was not suicidal or homicidal, and he contracted for safety (Doc. 101, Exhibit E, p. 11.)  Ms. Pitoniak referred Mr. Alexander to the next psychiatrist line.  (Doc. 101, Exhibit E, p. 11.)

Per the referral of Ms. Pitoniak, Dr. Dedania's next evaluation of Mr. Alexander was on July 2, 2011.  (Doc. 101, Exhibit H, p. 22, lines 6-7.)  At that time, Mr. Alexander complained about feeling paranoid and anxious, but that the medicine was helping but not all the time.  He was not suicidal or homicidal.  Dr. Dedania increased the Thorazine to 50 mg. in the morning, 50 mg. at 1:00 p.m., and 100 mg. at night.  (Doc. 101, Exhibit H, p. 22, lines 10-18.)

At approximately 10:00 p.m. on the evening of Friday, July 8, 2011, Mr. Alexander reported to Nurse Sutton that he was having increased paranoid thinking and that he believed someone was out to get him.  This spurred Nurse Sutton to call Ms. Pitoniak at

home, and Ms. Pitoniak spoke to Mr. Alexander the night of July 8, 2011, via telephone. (Doc. 101, Exhibit E, pp. 12-13.)  After speaking with Mr. Alexander, Ms. Pitoniak instructed Nurse Sutton to place Mr. Alexander on the next psychiatrist line.  (Doc. 101, Exhibit E, pp. 12-13 and Exhibit F, p. 64 line 14 through p. 65 line 11.)

Dr. Dedania evaluated Mr. Alexander on July 10, 2013.  Mr. Alexander complained of feeling paranoid and anxious.  He had no suicidal, homicidal ideation or depression.  Dr. Dedania adjusted Mr. Alexander's medication by increasing the Thorazine to 100 mg. three times per day, and Paxil to 40 mg. in the morning.  The Ativan was to continue at 1 mg. three times per day. (Doc. 101, Exhibit H, p. 24, lines 2-12.)  Dr. Dedania testified during his deposition that he did not place Mr. Alexander on suicide precautions on July 10, 2011, because, "According to my clinical interview with him and knowledge he had not expressed any suicidal ideations and there was no indication for me to put him on suicide watch." (Doc. 101, Exhibit H, p. 25, lines 16-21).

Ms. Pitoniak evaluated Mr. Alexander on July 11, 2011.  (Doc. 101, Exhibit E, pp. 12-13.)  Mr. Alexander indicated to Ms. Pitoniak that he felt a bit better and he was not suicidal or homicidal.  Follow up was to occur as needed.  (Doc. 101, Exhibit E, p. 13.)  At no time thereafter was Mr. Alexander deemed suicidal or at risk for suicide by the medical or mental health staff.  Mr. Alexander hung himself on July 19, 2011.

The Medical Administration Record (MAR) documents the prescription, time for dose, and when the medication was provided to the inmate.  See, Exhibit J.  Medications are provided to inmates by nursing staff.  The MAR confirms that Mr. Alexander was consistently provided his medications during the months leading up to his suicide.  (Doc. 101, Exhibit J.)

Plaintiff has produced an expert report from Edward J. Barbieri, Ph.D., who is a toxicologist.  (Doc. 101, Exhibit K.)  Dr. Barbieri opines that the toxicology results taken at autopsy indicate Mr. Alexander's whole blood concentration was consistent with the prescribed doses of Sinequan and Paxil.  (Doc. 101, Exhibit K, p. 7.)  Dr. Barbieri cannot opine as to whether there was Ativan in Mr. Alexander's blood at the time of autopsy.

## III. ISSUE

A.      SHOULD THIS HONORABLE COURT ADOPT THE REPORT AND RECOMMENDATION THAT SUMMARY JUDGMENT BE ENTERED IN FAVOR OF DEFENDANTS?

Suggested Answer: Yes

## III. ARGUMENT

It is submitted that the Magistrate Judge utilized the proper summary judgment standard which is:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  Celotex v. Catrett, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

There is an issue of material fact only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A plaintiff must "point to concrete evidence in the record that supports each and every essential element of his case" to survive summary judgment.  Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995).

**A.     SUMMARY JUDGMENT IS APPROPRIATE FOR THE PRIMECARE DEFENDANTS BECAUSE PLAINTIFF DOES NOT HAVE EVIDENCE TO SUPPORT RECKLESS INDIFFERENCE.**

The Third Circuit has recognized that the suicide of a pretrial detainee can support a recovery in a 42 U.S.C. § 1983 action.  Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023-1025 (3d Cir. 1991).  See also, Williams v. Borough of West Chester, 891 F.2d 458 (3d Cir. 1989); Freedman v. City of Allentown, 853 F.2d 1111 (3d Cir. 1988).  The standard of liability to be applied in this circuit in prison suicide cases is that "if [custodial] officials know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability." Colburn, 946 F.2d 1023 (internal citations omitted).

A plaintiff in a prison suicide case has the burden of establishing three elements:  (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of that vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability.  Id.

Reckless or deliberate indifference is articulated in Estelle v. Gamble, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).  Estelle involved Eighth Amendment claims alleging inadequate medical treatment.  The Court held that prison officials violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit "deliberate indifference to serious medical needs of prisoners." Id., at 104.  The standard enunciated in Estelle "requires [both that there be] deliberate indifference on the part of the prison officials and [that] the prisoner's medical needs . . . be serious." Monmouth Cty. Corr. Institutional Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987).

A serious medical need, as developed in Estelle, has two components.  The detainee's condition must be such that a failure to treat can be expected to lead to

substantial and unnecessary suffering, injury, or death.  Moreover, the condition must be
"one that has been diagnosed by a physician as requiring treatment or one that is so
obvious that a lay person would easily recognize the necessity for a doctor's attention."
Monmouth, 834 F.2d at 347 (internal citations omitted).

In Colburn v. Upper Darby Township, 838 F.2d 663, 664 (3d Cir. 1988), the Third
Circuit recognized that "particular vulnerability to suicide" represents a "serious medical
need."  However, the Third Circuit has recognized that neither the due process clause nor
the Eighth Amendment imposes liability for a negligent failure to protect a detainee from
self-inflicted injury.  Id.  A higher level of culpability, one involving "reckless or deliberate
indifference," is required.  See also, Colburn, 946 F.2d at 1023-1025 (3d Cir. 1991).
Therefore, it is clear that a level of culpability higher than a negligent failure to protect from
self-inflicted harm is required.  Id., at 1024.

The requirement of a "particular vulnerability to suicide" speaks to the degree of risk
inherent in the detainee's condition.  Id.  The requirement of "reckless or deliberate
indifference" implies that there must be "a strong likelihood, rather than a mere possibility,
that self-inflicted harm will occur."  Id. (internal citations omitted).  Even where a strong
likelihood of suicide exists, it must be shown that the custodial officials "knew or should
have known" of that strong likelihood.  Id.  There can be no reckless or deliberate
indifference to that risk unless there is something more culpable on the part of the officials
than a negligent failure to recognize the high risk of suicide.  Id.

Guided by these standards, it is clear that Plaintiff has not presented sufficient
evidence of a deliberate indifference to a serious medical condition or a particular
vulnerability to suicide.  Mr. Alexander received continuous mental health treatment during
his incarceration.  This included approximately nineteen evaluations by Ms. Pitoniak and the

psychiatrists between the time of intake and Mr. Alexander's suicide.  He was continually provided medication to address his mental health needs, and those medications were adjusted by the psychiatrists as clinically required.  At any point that Mr. Alexander sought mental health treatment, he was promptly provided treatment as shown by the responses to the sick call slips.  At no point after he was removed from suicide precautions on May 7, 2011, by Dr. Dedania did any of the medical professionals at MCCF believe Mr. Alexander to be suicidal or have a particular vulnerability to suicide.  Moreover, Mr. Alexander received his medications throughout his incarceration, and Plaintiff's expert opines that Sinequan and Paxil were in his system as prescribed at autopsy, and he cannot give any opinion as to the Ativan.

The record in this case is clear that Mr. Alexander received an extensive amount of treatment for his mental health condition.  There was never a belief that he was suicidal after May 7, 2011.  Moreover, he continually received medications which were monitored and adjusted consistent with his clinical presentation.  Therefore, it is respectfully submitted that Plaintiff cannot demonstrate a reckless indifference to a particular vulnerability of suicide in this case and Magistrate Judge Saporito properly recommended that summary judgment be entered in favor of the Defendants.

Plaintiff asserts that this Court should deny summary judgment based upon the case of Ponzini, et al. v. Monroe Cty., 3:11-CV-00413, 2015 WL 5123635 (M.D. Pa. August 31, 2015, Judge Mariani).  The Ponzini case is not controlling on this Court for multiple reasons.  First, it is not a decision of the Third Circuit or the Supreme Court.  Second, it is factually distinguishable from the present matter.  The Ponzini case was not a suicide case as is the present matter.  The plaintiff's theory in Ponzini was that there was a delay in providing medication to the decedent, which led to withdrawal.  Thereafter, an alleged improper dose

of medication was provided with allegedly caused the suicide.  It is not a suicide case as is the present case or Colburn.  Moreover, there are no allegations of treatment being refused to Mr. Alexander.

In the present case, Mr. Alexander was continually evaluated by Ms. Pitoniak and the psychiatrists.  Once Mr. Alexander was removed from suicide precautions, there never was a belief that he was suicidal.  The medical providers utilized there judgment and experience in assessing Mr. Alexander.  It has long been the law of this Circuit that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.  Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

Plaintiff asserts that Mr. Alexander may not have taken all of his medications as prescribed and that somehow that can equate to deliberate indifference on the part of the medical staff.  First, an inmate can refuse to take his medication.  There was no court order in place to force medicate Mr. Alexander.  Second, Plaintiff's toxicology expert agrees that the post mortem levels of Sinequan and Paxil were consistent with Mr. Alexander taking the medication at the prescribed dosage.  He cannot give any opinion as to whether the Ativan was taken.  At best he states that Mr. Alexander may not have taken a dose of Thorazine in or around the date of the suicide.  Thus, the record in this case is that Mr. Alexander may have missed a dose of one of four prescribed medications.  Missing a dose or even a couple of doses does not equate to deliberate indifference.  Moreover, even if it did, Plaintiff has produced no evidence that missing a dose or two of Thorazine had any role in the suicide of Mr. Alexander.

Finally, Plaintiff asserts that the PrimeCare suicide prevention policy was deficient because it does not provide a mechanism for the medical department being notified of court appearances of inmates.  However, it is undisputed that the suicide prevention policy is

premised upon NCCHC standards which are the national standards for jails in the United States.  Thus, at most, Dr. Datillo's opinion is that the PrimeCare policy should exceed national standards.  It is submitted that the law does not require a healthcare provider to exceed the standard of care.  Further, Dr. Datillo's opinion is merely a difference of opinion of what the policy is versus what it could be.  A difference of opinion does not amount to deliberate indifference.

Magistrate Judge Saporito authored a well-reasoned and thorough report and recommendation.  He applied the proper standard to the undisputed facts of record in this case.  The bottom line is that Mr. Alexander received continuous mental health treatment which included evaluations and medication.  At all times, the mental health team utilized their best judgment in providing care to Mr. Alexander.  At no time was care withheld from Mr. Alexander.  To the contrary, every time Mr. Alexander asked for help, and at times he did not ask for help, he was provided prompt medical attention.  Simply stated, Plaintiff cannot demonstrate sufficient evidence to overcome summary judgment in this case.

Respectfully submitted,

JOHNSON, DUFFIE, STEWART & WEIDNER

By:___s/John R. Ninosky_____
John R. Ninosky, Esquire
Attorney I.D. No. 78000
301 Market Street ~ P.O. Box 109
Lemoyne, PA  17043-0109
Telephone (717) 761-4540
Email:  jrn@jdsw.com
Counsel for PrimeCare Medical Defendants

Date:  October 5, 2016
813355

13

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on 5th day of October, 2016, I electronically filed the foregoing *Brief in Opposition to Plaintiff's Objections to the Report and Recommendation filed September 7, 2016,* with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

James A. Swetz, Esquire
Cramer, Swetz, McManus & Jordan, P.C.
711 Sarah Street
Stroudsburg, PA  18360
jaswetz@csmjlawyer.com
*Counsel for Plaintiff*

Mark T. Perry, Esquire
John R. Hill, Esquire
The Perry Law Firm, LLC
87 South Commerce Way, Suite 740
Bethlehem, PA  18017
mtp@theperrylawfirm.com
jrh@theperrylawfirm.com
*Counsel for Dr. Alex T. Thomas*

Gerard J. Geiger, Esquire
Newman, Williams, Mishkin,
   Corveleyn, Wolfe & Fareri
712 Monroe Street
Stroudsburg, PA  18360
ggeiger@newmanwilliams.com
*Counsel for Monroe County Defendants*

Thomas L. Mueller, Esquire
Lubell & Associates, P.C.
1012 West 9th Avenue, Suite 220
King of Prussia, PA  19406
tmueller@lubellassociates.com
*Counsel for Dr. Dedania*

JOHNSON, DUFFIE, STEWART & WEIDNER

By:      s/John R. Ninosky
         John R. Ninosky