UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| DEBRA L. ALEXANDER, adoptive parent and Administratrix of the Estate of Scott Alonzo Alexander | : : : : | |
| Plaintiff, | : : | CIVIL NO. 3:13-CV-01758 |
| v. | : : : | (Judge Kosik) |
| MONROE COUNTY, et al., | : : | |
| Defendants. | : | |

_____

## MEMORANDUM

Before the Court are objections by Plaintiff to a Report and Recommendation ("R&R") issued by United States Magistrate Judge Joseph F. Saporito, Jr.  For the reasons which follow, the Court will adopt, in part, and deny, in part, the R&R.

## I. BACKGROUND

On June 25, 2013, Plaintiff initiated this action by filing a Complaint, alleging violations of 42 U.S.C. § 1983 and Pennsylvania state law.  (Doc. 1).  Plaintiff filed an Amended Complaint on September 13, 2013 (Doc. 17), and then subsequently filed a Second Amended Complaint, which is the operative complaint, on November 5, 2013 (Doc. 37).  Plaintiff's claims stem from circumstances surrounding the suicide of decedent, Scott Alonzo Alexander, on July 21, 2011, while incarcerated at the Monroe County Correctional Facility.

On July 25, 2014, the Court dismissed all but Plaintiff's Eighth Amendment and state-law claims.  (Docs. 65 and 66).  After the parties had an opportunity to conduct discovery, Defendants filed motions for summary judgment on the remaining claims.  (Docs. 99, 106, 109, and 112).  Magistrate Judge Joseph F. Saporito, Jr. issued a R&R (Doc. 126), recommending granting Defendants' motions for summary judgment.  Plaintiff has filed objections to the R&R (Doc. 127).  Defendants have filed briefs in opposition to Plaintiff's objections. (Docs. 130, 131, 132, and 133).

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is "genuine" if there is sufficient evidence with which a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Childers v. Joseph, 842 F.2d 689, 693-94 (3d Cir. 1988) (citing Anderson, 477 U.S. at 248).  A factual dispute is "material" if it might affect the outcome of the case.  Anderson, 477 U.S. at 248.  In determining whether an issue of material fact exists, the court must consider the evidence in the light most favorable to the non-moving party.  Skerski v. Time Warner Cable Co., 257 F.3d 273, 278 (3d Cir. 2001); White v. Westinghouse Elec, Co., 862 F.2d 56, 59 (3d Cir. 1988).

A party seeking summary judgment always bears the initial burden of informing the court of the basis of its motion and identifying those portions of the record that it believes demonstrates the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  "If the moving party carries this initial burden," then the nonmoving party "must come forward with specific facts," rather than "some metaphysical doubt as to the material facts," that counter the moving party's arguments and show "that there is a genuine issue for trial."  United States v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011); see also Deitrick v. Costa, 2015 WL 1605700, at *4 (M.D. Pa. Apr. 9, 2015) ("More simply put a party moving for summary judgment who does not bear the burden of persuasion at trial is not required to negate the nonmovant's claim, but only point out a lack of evidence sufficient to support the nonmovant's claim.").  The non-moving party has the burden to "come forth with 'affirmative evidence, beyond the allegations of the pleadings,' in support of its right to relief."  U.S. Bank, Nat'l Ass'n v. Greenfield, Civ. No. 1:12-CV-2125, 2014 WL 3908127, at *2 (M.D. Pa. Aug. 11, 2014) (quoting Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004)).  "If a party fails to properly support an assertion of fact or fails to properly address another party's

assertion of fact as required by Rule 56(c)," a court may grant summary judgment or consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2-3).

Further, when objections are filed to a R&R of a Magistrate Judge, we must make a *de novo* determination of those portions of the report to which objections are made.  28 U.S.C. § 636(b)(1); see also Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3d Cir. 1989).  In doing so, we may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge.  28 U.S.C. § 636(b)(1); Local Rule 72.31.  Although our review is *de novo*, we are permitted to rely upon the Magistrate Judge's proposed recommendations to the extent we, in the exercise of sound discretion, deem proper.  See United States v. Raddatz, 447 U.S. 667, 676 (1980); see also Goney v. Clark, 749 F.2d 5, 7 (3d Cir. 1984).  For the portions not objected to, the usual practice of the district court is to give "reasoned consideration" to a magistrate judge's report prior to adopting it.  Henderson v. Carlson, 812 F.2d 874, 878 (3d Cir. 1987).

## III. Discussion

In the R&R, the Magistrate Judge recommended that Defendants' motions for summary judgment be granted.  Specifically, the Magistrate Judge recommended that the following claims be dismissed: (1) claims against Deborah Wilson, D.O. and Wendy Johnson, L.P.N., for waiver of claims against these two Defendants; (2) § 1983 claims against Dr. Thomas and Doctor Dedania because no reasonable jury could find that either doctors' treatment decisions were recklessly indifferent to Scott Alexander's vulnerability to suicide; (3) § 1983 claim against Officer Landon because Plaintiff failed to satisfy her burden of citing particular potential admissible evidence in the record to demonstrate the existence of a genuine dispute of material fact; (4) § 1983 claims against Monroe County because there was insufficient evidence to permit a reasonable jury to find that the County and its governing officials had actual or constructive knowledge of the purported policy deficiencies and that Plaintiff failed to establish an underlying deprivation of a constitutionally protected right with respect to Officer Landon and the medical defendants; (5) § 1983 claims against Warden

Asure because Plaintiff failed to identify any evidence to suggest that the Warden personally participated in any of the purported misconduct or evidence that the existing suicide-prevention policy created an unreasonable risk of the Eighth Amendment injury; (6) § 1983 claims against PrimeCare for the same reasons set forth in the claims against the County; and (7) state law negligence claims against Dr. Dedania, Dr. Thomas, and PrimeCare for Plaintiff's failure to support her state-law medical negligence claims by a qualified physician to opine to the standard-of-care under the Medical Care Availability and Reduction of Error Act ("MCARE"), 2002 Pa. Laws. 13 (codified in relevant part at 40 P.S. § 1303.512).

## PLAINTIFF'S OBJECTIONS

As an initial matter, the Court notes that Plaintiff does not raise any objections to the R&R dismissing Defendants Deborah Wilson, D.O. and Wendy Johnson, L.P.N.  As such, we have given reasoned consideration to this portion of the Magistrate Judge's R&R and will adopt his recommendation and grant summary judgment in favor of Defendants Deborah Wilson, D.O. and Wendy Johnson, L.P.N.

Plaintiff makes several objections to the Magistrate Judge's R&R as it relates to the remaining Defendants based upon § 1983 / Eighth Amendment claims.  Section 1983 of Title 42 of the United States Code offers private citizens a cause of action for violations of federal law by state officials.  See 42 U.S.C. § 1983; Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002).  To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Section 1983 "provides a remedy for deprivations of rights established elsewhere in the Constitution or federal laws," and is not an independent source of substantive rights. Estate of Smith v. Marasco, 318 F.3d 497, 505 (3d Cir. 2003).

## Deliberate Indifference to a Medical Need / Reckless Indifference to Risk of Suicide

Plaintiff contends that Defendants were deliberately indifferent to Scott Alexander's vulnerability to suicide and that the Magistrate Judge misapplied the standard for granting

summary judgment and invaded the province of the jury.  Specifically, Plaintiff contends that Defendants violated Scott Alexander's constitutional rights by failing to provide adequate suicide prevention measures, and in particular, failing to place him on suicide watch. Deliberate indifference is analyzed under a two prong test.  Estelle v. Gamble, 429 U.S. 97, 102 (1976).  "First, plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious. Additionally, the plaintiff must make a 'subjective' showing that defendant acted with 'a sufficiently culpable state of mind.' " Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

Under the first prong of the deliberate indifference test, a medical need is "serious" if it is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  Atkinson v. Taylor, 316 F.3d 257, 272-73 (3d Cir. 2003).  The Third Circuit has recognized that a "particular vulnerability to suicide" could represent a "serious medical need."  See Colburn v. Upper Darby Twp., 838 F.2d 663, 669 (3d Cir. 1988).  Thus, the contours of the right and action in prison suicide cases have established the burden upon the plaintiff to prove the following three elements: (1) the detainee had a particular vulnerability to suicide, (2) the custodial officer or officers knew ... of that vulnerability, and (3) those officers acted with reckless indifference to the detainee's particular vulnerability."  Colburn v. Upper Darby Twp., 946 F.2d 1017, 1023 (3d Cir. 1991) (internal quotations omitted); see Farmer, 511 U.S. 825 (clarifying the culpability requirement to require actual awareness of the risk).

To create liability, "the risk of self-inflicted injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges."  Woloszyn v. Cnty. of Lawrence, 396 F.3d 314, 320 (3d Cir. 2005).  "Liability cannot lie for negligence; the risk of self-inflicted harm must be obvious.  The burden for proving liability in a prison suicide case is a difficult one to meet, since 'a prison custodian is not the guarantor of a prisoner's safety.  We cannot infer from the

prisoner's act of suicide itself that the prison officials were recklessly indifferent in their obligation to ... take reasonable precautions to protect the safety of prisoners entrusted in their care." Wargo v. Schuylkill Cnty., Civ. No. 06-2156, 2008 WL 4922471, at *5 (M.D. Pa. Nov. 14, 2008) (citing Freedman v. City of Allentown, 853 F.2d 1111, 1115 (3d Cir. 1988)).

Finally, because a culpable state of mind is required to find deliberate indifference, "mere medical malpractice cannot give rise to a violation of the Eighth Amendment." White v. Napoleon, 897 F.2d 103, 108-09 (3d Cir. 1990); see also United States ex rel. Walker v. Fayette Cnty., 599 F.2d 573, 575 n. 2 (3d Cir. 1979) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law."). Thus, "as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990).

With the above tenants in mind, we now turn to each of Plaintiff's objections to the Magistrate Judge's R&R as they relate to each remaining defendant.

**a. Dr. Thomas**

Plaintiff objects to the Magistrate Judge's recommendation to grant summary judgment in favor of Dr. Thomas with respect to the § 1983 claim. Plaintiff contends that the Magistrate Judge erred by weighing Nurse Oswald's testimony regarding Scott Alexander "cheeking" his medication when considering summary judgment. Plaintiff also contends that a jury could infer Dr. Thomas was deliberately indifferent to Scott Alexander's vulnerability to suicide by reducing his suicide watch from level I to level II without the full benefit of Scott Alexander's full legal and medical file before him when making that decision.

The Magistrate Judge notes, and the parties do not dispute, Dr. Thomas's limited interaction with Scott Alexander. Dr. Thomas, a licensed physician specializing in psychiatry, met and evaluated Alexander one (1) time, on April 30, 2011. At the time of evaluation, Alexander was on Level I suicide watch since he was received into custody of the Monroe

County Correctional Facility six days earlier.  Dr. Thomas examined Alexander and found no suicidal or homicidal ideation and no psychotic symptoms.  Dr. Thomas's notes further reflect that Alexander explicitly expressed a desire to live for his family.  Dr. Thomas reduced Alexander from Level I suicide watch to Level II suicide watch, permitting Alexander amenities such as clothing, bedding, and normal food, but did not reduce the frequency of observation checks by corrections officers supervising him.  From then on, Alexander was seen by Dr. Dedania, a licensed physician who is board-certified in psychiatry.[1]

Plaintiff presented expert reports stating that Dr. Thomas should not have taken Alexander off of suicide watch and that Alexander had a mental illness, which included, among others, Bipolar Disorder.  Plaintiff's expert went on to indicate that individuals diagnosed with Bipolar Disorder will attempt suicide at least one time in their life.

The court notes that Dr. Thomas did not remove Alexander from suicide watch.  Dr. Thomas reduced the suicide watch level from Level I to Level II.  Furthermore, this evidence is not enough to get past summary judgment because the "vulnerability to suicide" examination "requires that the evidence establish that the particular individual, not members of a demographic class to which the individual belongs, exhibits a particular vulnerability to suicide."  Wargo, 2008 WL 4922471, at *6.  In order for a "particular vulnerability to suicide" to exist, there must be a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur."  Colburn, 946 F.2d at 1024.  While Plaintiff offered expert reports pointing toward a heightened risk of suicide, Plaintiff's own experts did not suggest that these factors represented a strong likelihood of self-inflicted harm.  See Joines v. Twp. of Ridley, 229 F. App'x 161, 162-63 (3d Cir. 2007).

We agree with the Magistrate Judge that Plaintiff has failed to identify any evidence to demonstrate that Dr. Thomas had any ongoing treating relationship with Alexander

---

[1] While Dr. Thomas never saw Alexander other than on April 30, 2011, on May 14, 2011, when Dr. Thomas was the on-call psychiatrist, he consulted by telephone with a nurse regarding Alexander being nervous and shaking.  Dr. Thomas prescribed an anti-anxiety drug, Ativan.  However, later that very same day, Dr. Dedania personally met and evaluated Alexander and modified his medications.

subsequent to the initial April 30, 2011 evaluation, had actual knowledge of any events of special significance or any statements of suicidal ideation that might support a claim based on Dr. Thomas's failure to subsequently reinstate Alexander to Level I suicide watch, or that Alexander was particularly vulnerable to suicide.[2] See Estate of Thomas v. Fayette Cnty., Civ. No. 14-00551, – F. Supp. 3d –, 2016 WL 3639887, at *13 n. 18 ("And indeed, there is a sound, pragmatic reason for the law to not quickly make such a logical jump. Were the law to impose liability upon a prison (or its officials) whenever there was *any* possibility for suicide (perhaps because of the presence of *some* recognized or presumed suicide correlates), prisons could be led to place *any* individual showing or suspected of having such suicide correlates into suicide watch, resulting in severe restrictions on a prisoner's liberty interests.").

Finally, the deposition testimony of Nurse Oswald does not create a genuine dispute of fact, and the Magistrate Judge did not weigh her testimony. The deposition testimony of Nurse Oswald does not reflect any dates or times of purported discussions with Dr. Thomas. Even more, it does not reflect any substance or content of the conversations. Thus, the Plaintiff has not "come forward with specific facts," rather than "some metaphysical doubt as to the material facts," that counter the moving party's arguments and show "that there is a genuine issue for trial." Donovan, 661 F.3d at 185.

**b. Dr. Dedania**

Plaintiff makes similar objections to the Magistrate's R&R in regards to Dr. Dedania. Plaintiff argues that Dr. Dedania was deliberately indifferent to Alexander's particular vulnerability to suicide based on his decision to reduce Alexander from Level II suicide watch to Level III mental health watch on May 7, 2011, as well as Dr. Dedania's failure to reinstate Alexander to suicide watch at some point prior to his death on July 19, 2011, particularly in light of Alexander's pending parole revocation. Finally, Plaintiff contends that the Magistrate Judge erred by weighing Nurse Oswald's testimony regarding Scott Alexander "cheeking" his

---

[2] The Court notes that Dr. Thomas did not remove Alexander from suicide watch. As set forth above, he only reduced Alexander's suicide watch level from Level I to Level II, permitting Alexander clothing, bedding, and normal food. The frequency of observation checks by corrections officers supervising Alexander remained the same.

medication when considering summary judgment.

The record shows that Dr. Dedania first met and evaluated Alexander on May 7, 2011. Alexander had been on suicide watch for two weeks.  He was being seen regularly by non-party Jennifer Pitoniak, LSW, a licensed social worker employed with PrimeCare as a mental health clinician.  In Pitoniak's evaluations with Alexander on May 2, 3, and 5 of 2011, Alexander reported feeling better and each time denied any suicidal or homicidal ideation. When Dr. Dedania met and evaluated Alexander on May 7, 2011, he found "[n]o suicidal, homicidal ideation or psychosis."  (Def.'s M.S.J., Doc. 109-1, at 10; Doc. 109-2, at 18).  Dr. Dedania reduced Alexander from Level II suicide watch to Level III mental health watch, still requiring observation by staff every thirty to sixty minutes.  Dr. Dedania further adjusted Alexander's medication.

Pitoniak continued to follow up and evaluate Alexander on May 9 and 10 of 2011. Each evaluation found Alexander to have no suicidal or homicidal ideation.  Additionally, Alexander reported that he felt much better on May 10, 2011, and contracted for safety.[3] Pitoniak discontinued Alexander from Level III mental health watch.

Dr. Dedania again met with and evaluated Alexander on May 14, 2011.  He found no suicidal or homicidal ideation or psychosis.  Dr. Dedania modified Alexander's medications and recommended a follow-up visit.  Dr. Dedania again met with and evaluated Alexander on June 4, 2011.  Dr. Dedania found no suicidal or homicidal ideation during this evaluation and again modified his medications.  On July 2, 2011, Dr. Dedania met with and evaluated Alexander.  While Alexander complained about feeling paranoid and anxious, he denied any suicidal or homicidal ideation.  Alexander further advised Dr. Dedania that he felt the medicine was helping, but not all the time.  Dr. Dedania again modified Alexander's medications and recommended a follow-up visit.  Dr. Dedania met with and evaluated Alexander for the last time on Sunday, July 10, 2011.  Alexander complained of increased

---

[3] A contract for safety is an agreement to seek help before acting on a suicidal impulse.  See Keohane v. Lancaster Cty., Civ. No. 07-3175, 2010 WL 3221861, at *3 n.5 (E.D. Pa. Aug. 13, 2010) (internal citations omitted).

anxiety and paranoid feelings but denied experiencing any depression or suicidal or homicidal ideation.  Dr. Dedania modified Alexander's medications and recommended a follow-up visit in two months.

Pitoniak met with and evaluated Alexander the following day, July 11, 2011. Alexander told Pitoniak that after Dr. Dedania increased his medication dosages that he was feeling a bit better.  He denied any suicidal or homicidal ideation and contracted for his safety.

On July 18, 2011, Alexander's parole was revoked.  That same day, during a telephone call from the jail to Alexander's girlfriend, Alexander expressed an intention to kill himself after his parole had been revoked.  (S.O.F., Doc. 124-7, at 35).  While the telephone call was recorded, there is no evidence of record that any defendants monitored the call or otherwise knew the content of the telephone conversation prior to Alexander's death.  Alexander hanged himself on July 19, 2011.

The "vulnerability to suicide" examination "requires that the evidence establish that the particular individual, not members of a demographic class to which the individual belongs, exhibits a particular vulnerability to suicide." Wargo, 2008 WL 4922471, at *6.  In order for a "particular vulnerability to suicide" to exist, there must be a "strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." Colburn, 946 F.2d at 1024.

The evidence in the record does not show that there was a "strong likelihood of self-inflicted harm" or that Alexander, himself, "was inclined toward self-inflicted harm." Joines, 229 F. App'x at 163.  Assuming, *arguendo*, that Plaintiff had shown a "strong-likelihood toward self-inflicted harm," Plaintiff has failed to show that Dr. Dedania "knew or should have known" about Alexander's alleged particular vulnerability to suicide, or that Dr. Dedania "acted with reckless indifference" to this knowledge.  See Colburn, 946 F.2d at 1023. Liability may not be imposed unless "there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide. Id. at 1025.  Instead, the "strong likelihood of suicide must be so obvious that a lay person would easily recognize the necessity for preventative action." Id.

Three professional observers concluded that Alexander was not suicidal and did not have homicidal ideation.  The record does not support a plausible inference that Dr. Dedania acted with a reckless indifference to a particular risk of suicide which was known or should have been known to him.  See Baez v. Lancaster Cty., 487 F. App'x 30, 31 (3d Cir. 2012) ("[T]he likelihood that [plaintiff] would harm himself was not obvious to the psychologist, let alone a layperson."); Bearam v. Wigen, 542 F. App'x 91, 92 (3d Cir. 2013) (stating that while the health professional "could conceivably be wrong, he cannot consciously disregard a risk he has found reason to believe does not exist.").

Plaintiff contends that Dr. Dedania was deliberately indifferent to Alexander's vulnerability to suicide because he should have known that Alexander was "cheeking" his medicine based from the deposition testimony of Nurse Oswald and that Dr. Dedania should have known about Alexander's parole revocation hearing.  This argument fails for the same reasons set forth in the analysis of Dr. Thomas.  That is, the deposition testimony of Nurse Oswald does not reflect any dates or times of purported discussions with Dr. Dedania.  Even more, it does not reflect any substance or content of the conversations.  Thus, the Plaintiff has not "come forward with specific facts," rather than "some metaphysical doubt as to the material facts," that counter the moving party's arguments and show "that there is a genuine issue for trial."  Donovan, 661 F.3d at 185.

Finally, we agree with the Magistrate Judge that there is no evidence in the record to demonstrate that Dr. Dedania had actual knowledge of Alexander's upcoming parole revocation hearing, its adverse outcome, or the subject matter of the telephone conversation with his girlfriend.  As the Magistrate Judge notes, Farmer v. Brennan, 511 U.S. 825 (1994), requires an actual, subjective knowledge of an excessive risk to inmate health or safety.  What the evidence does portray is Dr. Dedania providing Alexander with attentive medical care for nearly two-and-a-half-months and throughout this period, Alexander consistently denying, and the medical professionals evaluating, Alexander as not having any suicidal or homicidal ideations.  Moreover, at the time of decedent's death, he was not on suicide or mental health

watch.  Importantly, nothing in Alexander's behavior made his intentions so obvious that "a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges."  Colburn, 946 F.2d at 1025.

Accordingly, summary judgment is warranted for Dr. Dedania.  The evidence does not indicate that Alexander represented a particular vulnerability to suicide or that Dr. Dedania's treatment decisions were recklessly indifferent to Alexander's vulnerability to suicide.  "The legal standard in this area provides for liability in cases where prison officials callously ignored what should have been an obvious vulnerability to suicide on the decedent's part." Wargo, 2008 WL 4922471, at *10.  As such, the Court will grant summary judgment in favor of Dr. Dedania.

**c. Officer Landon**

Plaintiff next objects that the R&R incorrectly found that nurse Laura Zieger's statement - that Officer Landon accidently blew gum into decedent's mouth while performing CPR - was inadmissible hearsay.  We agree with the Magistrate Judge that this statement is hearsay.  However, we disagree with the conclusion that it may not be considered at the summary judgment stage.  "The rule in this circuit is that hearsay statements can be considered on a motion for summary judgment if they are *capable of being admissible at trial*."  Fraternal Order of Police, Lodge 1 v. City of Campden, Civ. No. 15-1963, – F.3d – , 2016 WL 6803036 (3d Cir. Nov. 17, 2016) (citing Stelwagon Mfg. Co. v. Tarmac Roofing Sys., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (emphasis added)).  The Third Circuit Court of Appeals has provided the following when considering hearsay statements with regards to a motion for summary judgment:

> the court need only determine if the nonmoving party can produce admissible evidence regarding a disputed issue of material fact at trial.  The proponent need only "explain the admissible form that is anticipated."  Thus, in ruling on Defendants' motion for summary judgment, the district court should have limited its inquiry to determining if the out-of-court statements Plaintiffs were relying on were admissible at trial, and they clearly were.  Plaintiffs identified the out-of-court declarants ... and noted their availability to testify.

> ... In <u>Philbin v. Trans Union Corporation</u> ... the hearsay statement by [an] unknown individual [was] not 'capable of being admissible at trial,' ... and could not be considered on a motion for summary judgment. Here, Plaintiffs identified the third-party declarants, and nothing suggests that those declarants would be unavailable to testify at trial. That is all that was required to survive that aspect of Defendants' motion for summary judgment.

<u>Fraternal Order of Police</u>, 2016 WL 2803036, at * 3 (internal citations omitted).

Similarly here, while the out-of-court statement made by Nurse Zieger that "Landon attempted to do CPR with gum in his mouth," is hearsay, Plaintiff has identified the out-of-court declarant to whom the above statement is alleged to have been credited - Officer Landon. Nothing suggests that as a party to this lawsuit, Officer Landon would be unavailable to testify at trial. "That is all that [is] required ...." <u>Id</u>.

While Officer Landon may have been the only individual present during the gum incident, we find enough evidence in the record that creates a genuine issue of material fact to preclude the granting of summary judgment in favor of Officer Landon. Specifically, there is a discrepancy between Officer Landon's first report of the incident, which fails to account for the gum incident at all, and his subsequent additional report filed two days later adding his account of the gum incident. The Court further notes a discrepancy between Nurse Williams's deposition testimony wherein she states she learned about the gum when Officer Landon advised her that he had turned to spit it out and it bounced off some concrete, whereas Officer Landon's additional incident report filed provides that the gum hit his arm and then fell into the decedent's mouth.

Based on the above, we find that Plaintiff has satisfied her burden of citing particular potentially admissible evidence in the record to demonstrate the existence of a genuine dispute of material fact as to Officer Landon. Therefore, we will deny Defendant's motion for summary judgment as to Officer Landon.

**d. PrimeCare, Monroe County, and Warden Asure**

Plaintiff objects to the R&R's analysis and conclusion granting summary judgment in favor of Primecare, Monroe County, and Warden Asure. Specifically, Plaintiff asserts that the

County and PrimeCare's suicide-prevention policy was not adequate, that Warden Asure failed to adequately supervise and correct the PrimeCare defendants, that Monroe County's policy or custom did not provide the inmate's legal file to medical staff which constitutes a "communication failure," and that the County should have prohibited correctional staff from chewing gum while on duty.

We have reviewed the Magistrate Judge's R&R as to these claims against the defendants and agree with the Magistrate Judge, and will therefore adopt this portion in full. As the Magistrate Judge notes, a successful claim against a municipality must show that the policy or custom actually caused the constitutional violation at issue. Estate of Thomas, 2016 WL 3639887, at * 16. Simply pointing out the existence of an allegedly unlawful policy or custom is not enough to maintain a § 1983 claim. Id. "A plaintiff bears the additional burden of proving that the municipal practice was the proximate cause of the injures suffered." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). "To establish the necessary causation, a plaintiff must demonstrate a 'plausible nexus' or 'affirmative link' between the municipality's custom and the specific deprivation of constitutional rights at issue." Id.

This causation requirement also applies to the claims against PrimeCare. As a state contractor, for PrimeCare to be liable under Monell, Plaintiff "must provide evidence that there was a relevant [PrimeCare] policy or custom, and that the policy *caused* the constitutional violation they allege." See Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003) (emphasis added).

Further, if the allegedly unconstitutional policy or custom does not facially violate federal law, liability will only be imposed if "the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000). "To satisfy this standard, a plaintiff must adduce evidence that the municipality (1) had notice that similar rights violations had occurred on such a widespread basis that they were likely to occur again and (2) failed to act to address that risk despite the known or

obvious consequences of inaction. Notice is generally established by a pattern of prior constitutional violations." Peters v. Cmty. Educ. Centers, Inc., 2014 WL 981557, at *4 (E.D. Pa. Mar. 13, 2014) (citing Berg, 219 F.3d at 276).

Finally, supervisory liability requires deliberate indifference on the part of the supervisor as well. Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir. 2001); see Estate of Thomas, 2016 WL 3639887, at * 18 (quoting Brown, 269 F.3d at 216) (noting that supervisory liability requires a showing that the existing custom or practice - without the unenforced or absent procedure - "created an unreasonable risk of the ultimate injury," that "the supervisor was aware that this unreasonable risk existed," and that "the supervisor was indifferent to the risk").

Plaintiff has not put forth record facts showing that either (1) Monroe County, PrimeCare, or Warden Asure knew that the policies or practices at the prison would lead to a constitutional harm and then implemented (or failed to implement as the case may be) the policies with deliberate indifference to that knowledge, or (2) that these policies or practices were so obviously deficient and "so likely to result in the violation of constitutional rights, that the policymakers of the [prison] can reasonably be said to have been deliberately indifferent." See Brown, 269 F.3d at 215.

Here, there is no indication that any of these Defendants had notice of previous constitutional deprivations as a result of the policies and practices in play, nor is there any factual record to support the conclusion that the policies would so obviously result in constitutional harm. For example, while the evidence of record demonstrates that Alexander was the sixth inmate at Monroe County to have attempted suicide within the five-year period preceding his death, all but one of these prior attempts were successful. As the Magistrate Judge notes, there is nothing to suggest that any of these prior attempted inmate suicides, including the successful suicide of Mumun Barbaros, involved a purported communication failure like that at issue here - the failure of prison officials to share legal records or court scheduling information with mental health providers to apprise them of potential "high risk"

events that could trigger suicidal ideation or conduct.  Nor is there any evidence suggesting that the use of chewing gum by corrections staff has adversely affected staff efforts to administer CPR to inmates in the past.  See Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) ("[A] single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker.").

For these reasons and the reasons set forth by the Magistrate Judge in his R&R, we will grant summary judgment in favor of Defendants PrimeCare, Monroe County, and Warden Asure.

**e. State Law Negligence Claims against Dr. Thomas, Dr. Dedania, and PrimeCare**

Finally, Plaintiff generally objects to the Magistrate Judge's recommendation that summary judgment be granted in favor of Dr. Thomas, Dr. Dedania, and PrimeCare, or in the alternative, asks the court to not exercise jurisdiction over these claims and allow her to pursue them in state court.

In articulating the standard for stating a medical malpractice claim, the Magistrate Judge correctly identified that a "plaintiff must provide a medical expert who will testify as to the applicable standard of care (*i.e.* the duty) that the physician owed the patient, that the physician breached that standard or duty, and that the breach was the proximate cause of the harm suffered.  Miville v. Abington Mem. Hops., 377 F. Supp. 2d 488, 490-91 (E.D. Pa. 2005).  Pennsylvania's Medical Care Availability and Reduction of Error Act ("MCARE"), 2002 Pa. Laws. 13 (codified in relevant part at 40 P.S. § 1303.512), provides that, in a medical professional liability action against a physician, an expert testifying on the applicable standard of care must "[p]ossess an unrestricted physician's license to practice medicine in any state or the District of Columbia."  40 P.S. § 1303.512(b)(1).  See Wexler v. Hecht, 928 A.2d 973, 981 (Pa. 2007) (holding that an unrestricted physician's license to practice medicine "unambiguously denotes a medical doctor or osteopath licensed by a state board appropriate to

such practices."). Finally, section 512 of MCARE is a rule of witness competency. <u>Miville</u>, 377 F. Supp. 2d at 493.

Applying the above to the instant case, it is readily apparent that the evidence of record shows that Plaintiff has attempted to support her state-law medical negligence claims against Dr. Thomas and Dr. Dedania, two physicians, with testimony of her expert who is a psychologist. Because Plaintiff's expert is a non-physician, he is not competent under MCARE to provide evidence on the applicable standard of care in a medical professional liability action against the two physicians. Accordingly, we will grant summary judgment in favor of Dr. Thomas, Dr. Dedania, and PrimeCare with respect to the state-law claims.

## IV. CONCLUSION

For the reasons set forth above, the Court will adopt, in part, and deny in part, the Magistrate Judge's R&R. An appropriate order follows.